No. 24-7497
Consolidated with Nos. 21-70168, 21-70670

————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————

YUROK TRIBE, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents.*

————————————

On Petitions for Review of Actions of the
U.S. Environmental Protection Agency

————————————

**BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY**

————————————

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

Of Counsel:                ROBERT N. STANDER
                          *Deputy Assistant Attorney General*

AMBER ARANDA
STEPHANIE SCHWARZ          REDDING COFER CATES
*Attorneys*                Environment and Natural Resources
U.S. Environmental Protection   Division
Agency                    U.S. Department of Justice
                          Post Office Box 7611
                          Washington, D.C. 20044
                          (202) 353-5561
                          redding.cates@usdoj.gov

# TABLE OF CONTENTS

GLOSSARY ......................................................................... viii

INTRODUCTION ................................................................... 1

STATEMENT OF JURISDICTION ............................................ 3

STATEMENT OF THE ISSUES ................................................. 4

PERTINENT STATUTES AND REGULATIONS ........................... 5

STATEMENT OF THE CASE .................................................... 5

    A.    Statutory and regulatory background .................................. 5

    B.    Factual background ......................................................... 7

    C.    Agency rulemaking proceedings ......................................... 9

SUMMARY OF ARGUMENT ................................................... 17

STANDARD OF REVIEW ...................................................... 19

ARGUMENT ....................................................................... 21

I.    EPA correctly interpreted TSCA's requirement to reduce exposure to decaBDE to "the extent practicable." ................................................................. 21

    A.    EPA's interpretation is the best reading of Section 2605(h)(4) ......................................................... 21

    B.    Petitioners' interpretation of "practicable" is an inferior reading of the statute .......................................... 27

II.    EPA's decision to issue a broad production, import, and processing ban on decaBDE, while declining to fabricate and impose an entirely new disposal and recycling regime, was lawful. ............................................. 34

i

A. The recycling exclusion is supported by substantial evidence.............................................34

    1. EPA made a thorough examination of existing information to reach the conclusion that identifying and segregating plastic containing decaBDE would be impracticable..............................................34

    2. Petitioners' second-guessing of EPA's recycling analysis is fatally flawed..............................38

B. EPA's decision to rely on its existing disposal regime—including for wastewater and sewage sludge—is reasonable.............................................46

    1. EPA's determination that its broad prohibitions and existing disposal regimes reduced DecaBDE exposure to the extent practicable was based on substantial evidence..............................................47

    2. Petitioners fail to demonstrate that regulation of disposal, including wastewater and sewage sludge, is practicable..............................................51

C. Under *Bluewater*, EPA is authorized to evaluate in stages..............................................56

III. Remedy .....................................................59

CONCLUSION .................................................59

CERTIFICATE OF COMPLIANCE.........................61

# TABLE OF AUTHORITIES

## Cases

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
  452 U.S. 490 (1981) ............................................................ 29

*ASSE Int'l., Inc. v. Kerry*,
  803 F.3d 1059 (9th Cir. 2015) ........................................ 19

*Bluewater Network v. EPA*,
  372 F.3d 404 (D.C. Cir. 2004) ............................... 56, 57, 59

*Bonnichsen v. United States*,
  367 F.3d 864 (9th Cir. 2004) .......................................... 19

*Conroy v. Aniskoff*,
  507 U.S. 511 (1993) .......................................................... 32

*Corrosion Proof Fittings v. EPA*,
  947 F.2d 1201 (5th Cir. 1991) ........................................ 20

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018) .......................................................... 32

*Kisor v. Wilkie*,
  588 U.S. 558 (2019) .......................................................... 26

*Lab. Council for Latin Am. Advancement v. EPA*,
  12 F.4th 234 (2d. Cir. 2021) ............................................ 19

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) .................................................... 21, 22

*Lopez v. Garland*,
  116 F.4th 1032 (9th Cir. 2024) ....................................... 22

*Martin v. United States*,

145 S. Ct. 1689 (2025) ........................................................ 32

*Michigan v. EPA*,
   576 U.S. 743 (2015) ........................................................ 26

*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................... 25, 26

*Nat. Res. Def. Council v. EPA*,
   735 F.3d 873 (9th Cir. 2013) ............................................ 20

*Salas v. United States*,
   116 F.4th 830 (9th Cir. 2024), *cert. denied*,
   145 S. Ct. 1470 (2025) ..................................................... 22

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
   554 F.3d 1076 (D.C. Cir. 2009) ........................................ 56

*Spring Spectrum L.P. v. Willoth*,
   176 F.3d 630 (2d Cir. 1999) ............................................ 20

*Union Neighbors United, Inc. v. Jewell*
   831 F.3d 564 (D.C. Cir. 2016) ................................ 28, 29, 32

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ........................................................ 19

*Vinyl Inst., Inc. v. EPA*,
   106 F.4th 1118 (D.C. Cir. 2024) ...................................... 19

**Statutes**

5 U.S.C. § 706 ..................................................................... 19

15 U.S.C. § 2605 ............................................................. 5, 45

15 U.S.C. § 2605(a) ............................... 6, 7, 12, 22, 23, 24, 32

iv

15 U.S.C. § 2605(a)(1) ................................................................... 33

15 U.S.C. § 2605(a)(2) ................................................................... 33

15 U.S.C. § 2605(a)(3) ................................................................... 33

15 U.S.C. § 2605(b) ......................................................................... 6

15 U.S.C. § 2605(c) .......................................................................... 6

15 U.S.C. § 2605(c)(2) ....................................... 2, 10, 21, 24, 32, 33, 34

15 U.S.C. § 2605(c)(2)(A) .......................................................... 23, 24

15 U.S.C. § 2605(c)(2)(A)(iv) .......................................................... 25

15 U.S.C. § 2605(c)(2)(A)(iv)(I) ....................................................... 45

15 U.S.C. § 2605(c)(2)(B) ................................................................ 23

15 U.S.C. § 2605(c)(2)(C) ................................................................ 24

15 U.S.C. § 2605(c)(2)(D) ................................................ 11, 12, 13, 24

15 U.S.C. § 2605(c)(2)(E) ................................................. 11, 12, 13, 24

15 U.S.C. § 2605(d) ............................................................. 2, 10, 21

15 U.S.C. § 2605(h) ..................... 2, 6, 7, 9, 11, 16, 22, 23, 24, 27, 33, 40

15 U.S.C. § 2605(h)(1) ................................................................. 7, 40

15 U.S.C. § 2605(h)(1)(A) ............................................................. 6, 10

15 U.S.C. § 2605(h)(1)(B) ............................................................. 6, 10

15 U.S.C. § 2605(h)(2) ...................................................................... 7

15 U.S.C. § 2605(h)(3) ................................................................. 7, 33

15 U.S.C. § 2605(h)(4) ............. 2, 7, 11, 13, 17, 22, 30, 32, 46, 52, 55, 58

15 U.S.C. § 2617(a)(1)(B)(i) ................................................................ 49

15 U.S.C. § 2618(a)(1)(A) ...................................................................... 3

15 U.S.C. § 2618(c)(1)(A) .................................................................... 19

15 U.S.C. § 2618(c)(1)(B)(i)(I) ....................................................... 19, 39

## Code of Federal Regulations

40 C.F.R. § 23.5 .................................................................................. 3, 4

40 C.F.R. § 751.403 ............................................................................. 10

40 C.F.R. § 751.405(a)(1)(ii) ............................................................... 43

## Federal Registers

84 Fed. Reg. 17345 (Apr. 25, 2019) ................................................... 36

84 Fed. Reg. 36728 (July 29, 2019) ........................................... 9, 10, 11

85 Fed. Reg. 45109 (Jul. 27, 2020) ......................................... 35, 36, 37

86 Fed. Reg. 880 (Jan. 6, 2021) 3, 8, 9, 10, 11, 12, 13, 14, 21, 22, 35, 38, 45, 47, 48, 49, 51, 58

86 Fed. Reg. 14398 (Mar. 16, 2021) ................................................... 14

88 Fed. Reg. 82287 (Nov. 24, 2023) ................................................... 14

89 Fed. Reg. 91486 (Nov. 19, 2024) ........ 4, 10, 15, 17, 25, 43, 49, 50, 58

## Legislative History

H.R. Rep. No. 1776 (1988) ...................................................... 26

162 Cong. Rec. 7984 (2016) .................................................... 30

**Dictionaries**

Black's Law Dictionary (10th ed. 2014) ............................... 23

Black's Law Dictionary (12th ed. 2024) ....................... 28, 30

# GLOSSARY

| | |
|---|---|
| decaBDE | decabromodiphenyl ether |
| EPA | U.S. Environmental Protection Agency |
| NSSS | National Sewage Sludge Survey |
| PBDE | polybrominated diphenyl ether congeners |
| PBT | persistent, bioaccumulative, and toxic chemical |
| RCRA | Resource Conservation Recovery Act |
| SDWA | Safe Drinking Water Act |
| TSCA | Toxic Substances Control Act |

## INTRODUCTION

Recognizing the toxic effect of the chemical decaBDE, EPA precludes the manufacture and import of the substance, stopping the influx of this chemical into the United States.  With respect to recycling and disposal of the products containing decaBDE already in existence within the country, however, consistent with its statutory requirements, EPA determined in 2021 and again in 2024 that regulating recycling and disposal of the substance—including through landfills, wastewater, and sewage sludge—is simply not practicable at this time.

In coming to this conclusion, EPA fully considered both the technological possibility of and the costs associated with regulation, as well as broader policy considerations, including the importance of recycling.  Because EPA's regulation of decaBDE—including its determination that regulation of recycling and disposal (including regulation of landfills, wastewater, and sewage sludge) is impracticable at this time—was reasonable in light of the record, the Court should deny these petitions.

The Toxic Control Substances Act ("TSCA") requires EPA to restrict the presence of "persistent, bioaccumulative, and toxic"

1

substances called "PBT chemicals" so that exposure to such chemicals is reduced "to the extent practicable." The parties agree that the chemical decaBDE is a PBT chemical appropriate for regulation under Section 2605(h). They disagree on the correct interpretation of "to the extent practicable." EPA interprets the phrase based on the plain meaning of Section 2605(h)(4), looking to the dictionary definition of the term combined with the statutory context. EPA finds that "to the extent practicable" means "achievable, feasible, workable and reasonable," given full consideration of all reasonably available information on the issues identified in section 2605(c)(2) and (d), including cost. Petitioners interpret "practicable" to mean "feasible," which they interpret to mean technically able to be accomplished, "without regard to [cost] or any other factors." Pet'rs' Br. at 35. EPA's interpretation is the best reading of Section 2605(h).

Applying its interpretation of "practicable," EPA's 2021 and 2024 rules broadly imposed a near total prohibition on manufacturing (including importing), processing, and distribution in commerce of decaBDE and products and articles to which decaBDE has been added. EPA determined that a similarly broad prohibition of recycling and

2

disposal was not practicable under the circumstances. Petitioners argue that EPA should have gone further than it did, prohibiting decaBDE-containing articles from being recycled, and imposing restrictions on disposal-related activities of decaBDE and decaBDE-containing materials. Petitioners are mistaken. EPA's decision took proper consideration of the costs and workability of such additional regulation and, given the exposure reductions that its broad prohibitions would achieve as well as the impact of such changes, found additional regulation to be unreasonable and impracticable. The record before EPA supports its decision.

Therefore, the Petitions for review should be denied.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under TSCA's judicial review provision. 15 U.S.C. § 2618(a)(1)(A). The petition for review was timely filed because the initial final rule was published on January 6, 2021, and promulgated on January 21, 2021. 86 Fed. Reg. 880 (Jan. 6, 2021), 1-ER-0002 ("2021 Final Rule"); *see also* 40 C.F.R. § 23.5 (allowing EPA to specify the date of promulgation for purposes of judicial review). On

January 27, 2021, Petitioners timely challenged the 2021 Final Rule in this Court. Nos. 21-70168, 21-70670 (filed Mar. 19, 2021).

The 2024 Amendments were published on November 19, 2024, 89 Fed. Reg. 91486, 1-ER-0017, and became effective under EPA regulations two weeks later, on December 3, 2024. *See* 40 C.F.R. § 23.5. The petition for review of the 2024 Amendments was filed on December 12, 2024. Dkt. No. 1.

## STATEMENT OF THE ISSUES

1. Whether EPA correctly interpreted TSCA's requirement to reduce exposure to decaBDE "to the extent practicable" to mean that EPA should consider prohibitions and restrictions that are achievable, feasible, workable, and reasonable, giving full consideration of all reasonably available information on the issues identified in TSCA sections 6(c)(2) and (d), including cost.

2. Whether EPA's determination that it was not practicable under the circumstances to prohibit decaBDE-containing plastics from being recycled by requiring all recyclers to identify, separate, and discard decaBDE-containing plastics as part of their operations, was supported by substantial evidence.

4

3.     Whether EPA's determination that it was not practicable at the present time given agency resources to create and impose a disposal regime uniquely for decaBDE-containing waste when other federal laws and regulations already govern the disposal of such waste, was supported by substantial evidence.

## PERTINENT STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Brief for Petitioner, except two references included in the concurrently-filed Supplemental Addedum.  9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.     Statutory and regulatory background

TSCA, in Section 2605 of Title 15, provides EPA with authority to regulate chemical substances and mixtures under their conditions of use.  Where EPA determines that such use of a chemical substance or mixture "presents an unreasonable risk of injury to health or the environment," Section 2605 instructs EPA to apply one or more requirements, including:  prohibiting or restricting the substance's manufacture, processing, or distribution in commerce; requiring the substance be marked with warning and instructions for use;

prohibiting, limiting, or otherwise regulating the manner or method of the substance's commercial use; and prohibiting or regulating the manner or method by which the substance may be disposed. *See* 15 U.S.C. § 2605(a) *et seq.*

Section 2605(b) requires EPA to conduct "risk evaluations," identifying substances as "high" and "low" priority for evaluation, and setting standards and deadlines for the evaluation process. 15 U.S.C. § 2605(b). If, after that process, EPA determines that the substance "presents an unreasonable risk of injury to health or the environment," then Section 2605(c) details the process and requirements for issuing 2605(a) rules prohibiting, restricting, labeling, or otherwise regulating the substance. 15 U.S.C. § 2605(c).

Section 2605(h), on the other hand, applies to persistent, bioaccumulative, and toxic chemicals listed on the 2014 version of the TSCA workplan and for which specified findings are made ("PBT" chemicals). 15 U.S.C. §§ 2605(h)(1)(A)-(B). These findings included identifying chemicals for which exposures were "likely" based on EPA's development of an "exposure and use assessment." 15 U.S.C. § 2605(h)(1)(B). Added as part of the 2016 amendments to TSCA,

6

Section 2605(h) required EPA to take "expedited action" on such PBT chemicals. 15 U.S.C. § 2605(h)(1). It required EPA, "under subsection (a)," to issue a proposed rule regulating each PBT chemical within 3 years of the act's passage—by June 22, 2019—and issue a final rule 18 months thereafter or sooner. 15 U.S.C. § 2605(h)(1), (3). Unlike the typical Section 2605(a) process, EPA was explicitly not required to conduct a risk evaluation. 15 U.S.C. § 2605(h)(2).

Section 2605(h) provides additional requirements to guide EPA's selection of regulatory tools for PBT chemicals. *See* 15 U.S.C. § 2605(h)(4). The Act requires:

> In selecting among prohibitions and other restrictions promulgated in a rule under subsection (a) pursuant to paragraph (1), the Administrator shall address the risks of injury to health or the environment that the Administrator determines are presented by the chemical substance and shall reduce exposure to the substance to the extent practicable.

*Id.*

## B. Factual background

This petition concerns EPA's regulation of decabromodiphenyl ether ("decaBDE"). DecaBDE is a chemical used as an additive flame retardant in plastic enclosures for products including televisions, computers, audio visual equipment, and wires and cables used for

7

electronics and communication equipment. 86 Fed. Reg. at 884, 1-ER-
0006 (citing DecaBDE Prelim. Info. at 4 (Aug. 2017)). It is also used as
a flame retardant in replacement parts for aircraft and automobiles and
other associated applications. *Id.* Domestic production of decaBDE was
"voluntarily phased out by all domestic manufacturers in 2013."
Exposure and Use Assessment § 4.12, 3-ER-0407. Historically,
decaBDE had been used in "textiles and upholstered articles (including
carpets, upholstery fabric, back coatings, and cushions), wire and cables
for communications and electronics, and other miscellaneous
applications," but "many [of these] historical uses" have also been
phased out. *Id.* at § 4.4.1., 3-ER-0309.

DecaBDE is toxic to aquatic animals and certain terrestrial
invertebrates, like earthworms. Env't. & Hum. Health Hazards of Five
PBT Chemicals, at 8 (June 2018), 3-ER-0420. It does not appear to
affect aquatic vegetation, algae, and terrestrial-grown vegetables. *Id.*
EPA's review of the scientific literature showed "the potential for
developmental, neurological, and immunological effects, general
developmental toxicity and liver effects in mammals" as well as "some
evidence of genotoxicity and carcinogenicity" based on studies of mice

8

and rats. 86 Fed. Reg. at 885, 1-ER-0007; Env't & Hum. Health
Hazards of Five PBT Chemicals, at 12 (June 2018), 3-ER-0415.

EPA's Exposure and Use Assessment ("Assessment") was
compiled based on a review of available literature. 84 Fed. Reg. 36728,
36733 (July 29, 2019), 1-ER-0058 ("Proposed Rule"). EPA considered
release data from the Toxics Release Inventory (TRI), which showed a
decrease in releases reported in each industry sector using decaBDE,
corresponding to the voluntary phaseout of manufacturing. Exposure
and Use Assessment, p. 21, 3-ER-0314. EPA also noted that the
number of facilities reporting TRI releases had "decreased from several
dozen to only one manufacturer and 23 other facilities. The total yearly
releases to all media and quantities managed as waste [saw] a similar
decline from millions to thousands of pounds." *Id.*

## C.   Agency rulemaking proceedings

Faced with a short statutory deadline and sufficient evidence to
conclude that decaBDE is persistent, bioaccumulative, and toxic within
the meaning of Section 2605(h), EPA issued a proposed rule on July 29,
2019, calling for a general prohibition on the manufacture (including
import), processing, and distribution in commerce of decaBDE. 84 Fed.

9

Reg. at 36728, 3-ER-0053. The proposed rule provided a 60-day comment period, which was extended an additional 30 days. 86 Fed. Reg. at 885, 1-ER-0007.

The comment period closed on October 28, 2019. *Id.* EPA issued its final rule on January 6, 2021. *Id.* at 880, 1-ER-0002. EPA affirmed in the final rule that decaBDE met the Section 2605(h)(1)(A) and (B) criteria for expedited action. *Id.* at 885, 1-ER-0007. EPA imposed the near-total prohibition on the manufacture (including import), processing, and distribution in commerce of decaBDE and decaBDE-containing products and articles, with varying compliance deadlines not at issue here. *Id.* at 887, 1-ER-0009.[1]

EPA determined that what measures might be "practicable" meant "achievable, feasible, workable and reasonable," giving full consideration of all reasonably available information on the issues identified in 15 U.S.C. § 2605(c)(2) and (d), including cost. 86 Fed. Reg.

---

[1] EPA adopted the definition of "Article" found in 40 C.F.R. § 751.403, which is "a manufactured item: [w]hich is formed to a specific shape or design during manufacture," and "[w]hich has end use function(s) dependent in whole or in part upon its shape or design during end use." 89 Fed. Reg. at 91510, 1-ER-0041. A "product" is "anything that contains [decaBDE] that is not an article." 2020 RTC at 39, 2-ER-0124.

at 883, 1-ER-0005.  Consequentially, EPA concluded that it may

consider in its interpretation of "practicable" the impacts, including

costs and burdens, with adopting regulations on parts and articles, and

take into account congressional concerns in under subsections (c)(2)(D)

and (E) with regulating articles.  84 Fed. Reg. at 36746, 2-ER-0071; 86

Fed. Reg. at 884, 1-ER-0006.

EPA also explained that it took "a whole chemical approach in

implementation of the 15 U.S.C. § 2605(h)(4) to reduce exposure [to the

chemical substance to the extent practicable]' standard by broadly

addressing any activity for the chemical, unless EPA determined that

doing so would not be practicable."  2020 Response To Comments at 105

("2020 RTC"), SER-0003; *see also* 86 Fed. Reg. at 894, 1-ER-0016

(prohibiting "all" manufacturing and processing activities within 60

days of publication, with alternative deadlines or exclusions based on

practicability determinations); 2020 RTC at 17-18, 2-ER-0102–03 ("This

approach ensures that any activity involving a [15 U.S.C. § 2605(h)]

PBT chemical, past, present or future, is addressed by the regulatory

approach taken, whether through resumption of past activities or the

initiation of similar or other activities in the future.").

11

Thus, EPA determined that a broad prohibition focusing on *all* manufacture and processing of decaBDE and decaBDE products and articles, with a near immediate effective date, was practicable and would have the most immediate and long-term impact on the potential for decaBDE exposures. 2020 RTC at 61, 2-ER-0146. EPA noted that under Section 2605(a), "EPA has no authority to regulate consumer use directly, but can impact the manufacture, processing and distribution for a consumer use and has done so through the prohibitions being adopted in this final rule." 2020 RTC at 53, 2-ER-0138. EPA's broad prohibition allowed for a limited number of extended compliance deadlines, taking into account concerns regarding timing, costs, burdens, and availability of alternatives. 86 Fed Reg. at 888, 1-ER-0010; 2020 RTC at 41, 2-ER-0126.

Some commenters argued EPA had no authority to regulate decaBDE-containing replacement parts and articles for complex durable and consumer goods absent risk findings pursuant to subsection (c)(2)(D) and (E), "representing Congress's recognition of the special burdens associated with regulating replacement parts and articles." 86 Fed. Reg. at 884, 1-ER-0006. EPA disagreed, reiterating that EPA may

consider the congressional concerns raised in subsection (c)(2)(D) and (E) when interpreting what regulatory controls are "practicable," but that the 15 U.S.C. § 2605(h)(4) mandate did not require the findings in subsections (c)(2)(D) and (E). *Id.*; 2020 RTC at 28, 2-ER-0113. Other commenters challenged EPA's decision to make the prohibitions effective nearly immediately. EPA explained that its presumption of near immediate compliance dates is appropriate unless "fact-based rebuttal information" support an alternative compliance deadline. 2020 RTC at 41, 2-ER-0126.

Conversely, other commenters urged EPA to take increased measures, including that a "total ban" and/or regulation of recycling (a "processing" activity under TSCA) and disposal activities would be practicable. EPA disagreed here as well. EPA determined that regulation of disposal, recycling, commercial use, occupational exposures, and use in research and development activities was not practicable under the circumstances. 86 Fed. Reg. at 886-87, 889, 1-ER-0008–09, 0011. In general, where the activity area was already subject to federal regulatory controls, EPA determined that additional regulatory controls were not immediately practicable given the

13

potential confusion, duplication, and costs and given the significant impact expected with the broad prohibitions established.  In other instances, EPA determined that regulating the activity area would not be practicable given the extreme burden and low exposure reductions that might be achieved.  *See generally* 86 Fed. Reg. at 886-87, 889, 1-ER-0008–09, 0011; 2020 RTC § 1.5, 2-ER-0115–23, 2024 Response To Comments § 2.1, 6-ER-1354–57 ("2024 RTC").

On January 27, 2021, Petitioners challenged the 2021 Final Rule in this Court.  Nos. 21-70168, 21-70670 (filed Mar. 19, 2021).

On March 16, 2021, EPA issued a request for additional public comments on five final rules it had issued under TSCA, including the rule regarding decaBDE.  86 Fed. Reg. 14398 (Mar. 16, 2021), 6-ER-1293.  On March 15, 2022, EPA moved this Court for a voluntary remand without vacatur of the 2021 Final Rule and to place the petitions in abeyance, which this Court granted on June 23, 2022.  No. 21-70168, Dkt. Nos. 31-1, 41.

On November 24, 2023, EPA proposed amendments to the 2021 Final Rule and invited comments on those amendments.  88 Fed. Reg. 82287 (Nov. 24, 2023), 6-ER-1267 ("2023 Proposed Amendments").

14

On November 19, 2024, EPA published the 2024 Amendments to the 2021 Rule. The final revisions included: (i) addressing concerns with the broad prohibition in the 2021 rule, i.e., providing an allowance for unintentional amounts of decaBDE present in products and articles at concentrations less than 0.1% by weight, and providing an extension of the compliance date for the phase-out of processing and distribution in commerce of decaBDE-containing wire and cable insulation for nuclear power generation facilities; and (ii) seeking additional exposure reductions that EPA deemed now practicable, i.e., prohibiting releases to water during the manufacturing, processing, and distribution in commerce of decaBDE and decaBDE-containing products, and requiring the use of personal protective equipment (PPE) during certain activities involving decaBDE, subject to several exceptions. 89 Fed. Reg. at 91487, 1-ER-0018.

The 2024 Amendments did not reevaluate the 2021 Rule's decision to exclude recycling of decaBDE from its broad prohibition on processing decaBDE-containing products and articles, reasoning that it remained impracticable to sort or remove decaBDE-containing plastic from recycling streams. *Id.* The 2024 Amendments did not prohibit

wastewater discharges from recycling facilities or wastewater treatment plants for the same reason. *Id.* at 91497, 1-ER-0028 ("EPA is also not imposing specific requirements for wastewater treatment plants, unless those facilities are manufacturing, processing, and/or distributing decaBDE or decaBDE containing products. EPA determined that it is not practicable to require all wastewater treatment plants to test and potentially treat for decaBDE."); *id* at 91498, 1-ER-0029 ("EPA is not extending this requirement to . . . recycled materials that may contain decaBDE . . . it would be extremely burdensome to identify articles containing decaBDE to determine if a facility that recycles articles is subject to this final release to water prohibition."). The impracticability of requiring wastewater treatment plants to test for the presence of decaBDE also led EPA to conclude that EPA could not practicably regulate land applied sewage sludge or other "biosolids" that come from such treatment plants. 2024 RTC at 47, 6-ER-1396. The 2024 Amendments did not reevaluate the 2021 Rule's decision to refrain from establishing "a TSCA regulatory program for disposal" because "imposing a requirement under TSCA [Section 2605(h)] to treat waste containing [decaBDE] that are not hazardous under Resource

Conservation and Recovery Act (RCRA) as if they were hazardous waste would have impacts on hazardous waste disposal capacity and be very expensive for States and local governments as well as for affected industries." 89 Fed. Reg. at 91495, ER-0026.

Petitioners timely filed the instant challenge to the 2024 Amendments on December 12, 2024, and the Court consolidated it with the two earlier challenges to the 2021 Final Rule. Dkt. Nos. 1, 13.

## SUMMARY OF ARGUMENT

The Court should deny the petitions for review.

First, EPA's interpretation of 15 U.S.C. § 2605(h)(4) is the best reading of the statute. Congress empowered EPA to select restrictions of PBTs like decaBDE "to reduce exposure to the substance to the extent practicable." In deciding which restrictions were practicable, EPA considered dictionary definitions of the term, which include technical feasibility as well as reasonableness and capacity. It also considered the statutory context supporting EPA's consideration of factors including "the reasonably ascertainable economic consequences of the rule" and congressional concerns with regulating parts and articles. Petitioners' interpretation is merely to substitute "feasible" for

17

"practicable," by which they mean those restrictions which are technically achievable, regardless of the consequences, including cost impacts and other concerns. This is not what TSCA says, nor is it what Congress intended.

Second, using the correct interpretation of "practicable," EPA conducted an examination of the available information and data to determine which restrictions on decaBDE were practicable. This included a broad prohibition on the manufacture (including import), processing, and distribution in commerce of decaBDE and decaBDE-containing products and articles. EPA did not prohibit the recycling of decaBDE-containing plastics, directly prohibit the use of decaBDE-containing products and articles, regulate all potential workplace-related decaBDE exposures where the potential for worker exposure is minimal, or add the prohibitions of disposal of decaBDE-containing materials and waste that petitioners sought. EPA found that regulation in these areas was not practicable because such regulation would be wasteful or too costly, particularly in some cases given the minimal potential for exposures, or would, for example, cause confusion where there are existing regulatory regimes. These decisions were

18

lawful under TSCA, and Petitioners' arguments to the contrary flow

from their misapprehension of TSCA's practicability standard.

## STANDARD OF REVIEW

TSCA provides that judicial review shall be "in accordance with

chapter 7 of Title 5," the Administrative Procedure Act. 15 U.S.C.

§ 2618(c)(1)(A). The court "shall hold unlawful and set aside such rule"

only "if the court finds that the rule is not supported by substantial

evidence in the rulemaking record taken as a whole." 15 U.S.C.

§ 2618(c)(1)(B)(i)(I).[2] Substantial evidence is "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion."

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). Courts

---

[2] Petitioners' statement that TSCA "incorporates" the Administrative
Procedure Act's arbitrary or capricious standard, *see* 5 U.S.C. § 706, is
technically incorrect and irrelevant for this challenged rule. Pet'rs' Br.
24-25. TSCA applies the substantial evidence test to EPA rules like the one
challenged here. 15 U.S.C. § 2618(c)(1)(B)(i)(I) ("the standard for
review prescribed by [the APA] shall not apply…"). But this Court has
recognized that the distinction between the "substantial evidence" and
"arbitrary and capricious" tests is largely semantic, particularly as
applied to review of agency factual conclusions. *See Bonnichsen v.
United States*, 367 F.3d 864, 880 n.19 (9th Cir. 2004); *ASSE Int'l., Inc.
v. Kerry,* 803 F.3d 1059, 1072 (9th Cir. 2015) ("as a practical matter, the
arbitrary and capricious standard incorporates the substantial evidence
test. . ."). *But see Lab. Council for Latin Am. Advancement v. EPA*, 12
F.4th 234, 245 (2d. Cir. 2021); *Vinyl Inst., Inc. v. EPA*, 106 F.4th 1118,
1125 (D.C. Cir. 2024).

"must affirm the Administrator's finding where there is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Nat. Res. Def. Council ("NRDC") v. EPA*, 735 F.3d 873, 877 (9th Cir. 2013) (internal quotation marks and citations omitted). Under this standard, a court will not set aside an agency's decision so long as it is "supported by less than a preponderance but more than a scintilla of evidence." *Spring Spectrum L.P. v. Willoth*, 176 F.3d 630, 638 (2d Cir. 1999) (internal citations and quotation marks omitted). Likewise, while the substantial evidence standard calls on this Court to "give careful scrutiny to agency findings," this Court must "at the same time, accord appropriate deference to administrative decisions that are based on agency experience and expertise." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214 (5th Cir. 1991) (citation omitted). So long as the agency "cogently explain[s] why it has exercised its discretion in a given manner" and offers a "rational connection between the facts found and the choice made," its action will survive substantial evidence review. *Id.* (quotation omitted).

In deciding questions of statutory interpretation, "[c]ourts must exercise their independent judgment," but "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). To resolve the meaning of disputed statutory language, a court shall adopt the interpretation that the court, "after applying all relevant interpretive tools, concludes is best." *Id.* at 400. "[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Id.* at 413.

## ARGUMENT

## I.     EPA correctly interpreted TSCA's requirement to reduce exposure to decaBDE to "the extent practicable."

### A.     EPA's interpretation is the best reading of Section 2605(h)(4).

EPA's interpretation—that reducing exposure to decaBDE "to the extent practicable" means "achievable, feasible, workable and reasonable," giving full consideration of all reasonably available information on the issues identified in 15 U.S.C. § 2605(c)(2), (d), including cost—is the best reading of the statute. *See* 86 Fed. Reg. at

21

883-84, 1-ER-0005–06. EPA's interpretation gives meaning to the plain text of Section 2605(h)(4) and its context and placement in TSCA's structure.

In determining the best interpretation of the statute, courts must "interpret statutes, no matter the context, based on the traditional tools of statutory construction." *Loper Bright Enters.*, 603 U.S. at 403. We begin with the plain language of the statute. *Lopez v. Garland*, 116 F.4th 1032, 1043 (9th Cir. 2024); *see also Salas v. United States*, 116 F.4th 830, 839 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1470 (2025). For PBT chemicals such as decaDBE, Section 2605(h) requires the Administrator to take "expedited action" to propose and finalize a rule under Section 2605(a) for that chemical. The statute further specifies in subsection (4) that:

> In selecting among prohibitions and other restrictions promulgated in *a rule under subsection* (a) pursuant to paragraph (1), the Administrator shall address the risks of injury to health or the environment that the Administrator determines are presented by the chemical substance and shall reduce exposure to the substance to *the extent practicable*.

15 U.S.C. § 2605(h)(4) (emphasis added).

First, the phrase "to the extent practicable" and term "practicable" authorizes consideration of costs and burdens. Although these terms

22

are not defined in Section 2605(h), nor are they defined elsewhere in TSCA or its legislative history, Black's Law Dictionary contemporaneously defined the term as "reasonably capable of being accomplished; feasible in a particular situation." Black's Law Dictionary (10th ed. 2014). Thus, EPA noted that "the term 'practicable' includes feasibility as a factor but also includes what is reasonable in light of all circumstances." 2020 RTC at 26, 2-ER-0111. EPA noted that other dictionaries offer similar formulations: "any idea or project which can be brought to fruition or reality without unreasonable demands." 2020 RTC at 26 n. 2, 2-ER-0111 (citing The Law Dictionary.com. https://thelawdictionary.org/practicable (June 2020).

Second, the fact that section 2605(h) requires rulemaking under that section to result in a "rule under subsection (a)" necessitates consideration of costs because such rules must be "in accordance with subsection (c)(2)." 15 U.S.C. § 2605(a), (h). Section 2605(c)(2)(A) explicitly requires EPA to consider the reasonably available information regarding the chemical substance's health effects, exposure, and environmental effects; benefits of the chemical substance; and the

23

reasonably ascertainable economic consequences of the rule. 15 U.S.C.

§ 2605(c)(2)(A). Section 2605(c)(2)(B) then requires EPA to consider

those same factors "to the extent practicable" when selecting its

regulatory approach to "prohibitions and other restrictions" of the

chemical substance in question. 15 U.S.C. § 2605(c)(2)(B).

Other paragraphs in section 2605(c)(2) require EPA, as part of a

rulemaking, to consider alternatives and, absent specified risk findings,

to exempt replacement parts and limit prohibitions on articles. 15

U.S.C. § 2605(c)(2)(C)-(E). EPA correctly reasoned that "because

[section 2605](h) requires a [section 2605](a) rule 'in accordance with

subsection (c)(2),' EPA does not believe it is reasonable to ignore the

concerns addressed by Congress in these . . . provisions of [section

2605](c)(2) in determining how to 'reduce exposures to the extent

practicable.'" 2020 RTC at 29, 1-ER-0114. This statutory context gives

additional support to EPA's decision to look to "reasonableness" in

addition to mere technical feasibility.

Therefore, in the final rule EPA chose to take account of both

"[d]ictionary definitions of 'practicable,'" which "include technical

feasibility as well as characteristics relating to reasonableness and

24

capacity" while also "tak[ing] into consideration the statutory context"
that explicitly requires it to consider "economic consequences." 89 Fed.
Reg. at 91491-93, 1-ER-0022–24; 15 U.S.C. § 2605(c)(2)(A)(iv). EPA
explained that its approach asks "[w]hether a regulatory option is
achievable, feasible, workable and reasonable [which] inherently takes
into consideration circumstances, such as the economic burden and
complexities with an option, the utility of the chemical, and whether
there are technically and economically feasible alternatives available
for the chemical." 2020 RTC at 26, 2-ER-0111.

EPA's interpretation is consistent with other regulatory regimes
where Congress has required rules to be set to their "practicable"
extents. For example, Petitioners cite the Supreme Court's opinion in
*State Farm*. *See* Pet'rs' Br. 25, 44. In that case, the Supreme Court
analyzed the National Highway Safety Administration's crash
protection requirements. *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State
Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 33 (1983). The statute required
the agency to "issue motor vehicle safety standards that shall be
practicable, shall meet the need for motor vehicle safety, and shall be
stated in objective terms." *Id.* (cleaned up). The Court held that

25

"Congress intended safety to be the preeminent factor" in setting the standards at issue. *Id.* at 55. Nevertheless, the Court held that the "agency is correct to look at the costs as well as the benefits" and "it must also reconsider its judgment of the *reasonableness* of the monetary and other costs associated with the Standard." *Id.* at 54-55 (emphasis added). The Court also quoted the legislative history to note:

> In establishing standards the Secretary must conform to the requirement that the standard be *practicable*. This would require consideration of *all relevant factors*, including technological ability to achieve the goal of a particular standard as well as consideration of economic factors.

*Id.* at 55 (citing H.R. Rep. No. 1776, at 16 (1988).) (emphasis added).

Similarly, in *Michigan*, the Supreme Court held that it was *unreasonable* for EPA to interpret an ambiguous statutory standard of "appropriate" and "necessary" "to mean that cost is irrelevant," but noted that it would be up to EPA "to decide (as always, within the limits of reasonable interpretation) how to account for costs." *Michigan v. EPA*, 576 U.S. 743, 759 (2015); *see also Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (Kavanaugh, J., concurring in the judgment) ("open-ended terms like "reasonable," "appropriate," "feasible," or "practicable . . . [are

the] kinds of terms [that] afford agencies broad policy discretion, and courts allow an agency to reasonably exercise its discretion . . .").

In this case, while EPA explained that the cost of compliance was not the sole factor, it found it "reasonable to consider the economic impacts in addition to other factors like the limited reduction of exposures that might be achieved with a more restrictive option, the complexities and societal burdens with more restrictive options, and the current absence of alternatives that would be necessary if adopting a more restrictive option." 2020 RTC at 26, 2-ER-0111. This analysis was entirely consistent with the correct interpretation of "practicable."

Because EPA's interpretation accounts for the plain meaning of "practicable" and Section 2605(h)'s relationship to TSCA's overall structure for regulating toxic chemicals, and in a manner consistent with the Supreme Court's reading of "practicable" in similar statutes, EPA's interpretation is superior.

## B. Petitioners' interpretation of "practicable" is an inferior reading of the statute.

In contrast to EPA's interpretation, which seeks to capture not only the plain meaning of the words Congress chose and the statutory context into which it put them, Petitioners simply replace "practicable"

27

with a word Congress didn't use: "feasible."  Pet'rs' Br. 31 ("the ordinary meaning of 'practicable' is 'feasible'").  This definition is inferior for at least three reasons.

First, as EPA noted in its response to comments, "[h]ad feasibility alone been intended, Congress could have used that term." 2020 RTC at 26, 2-ER-0111.  It did not.  This is so because "feasible" and "practicable" are not interchangeable.  Recall that Black's definition of "practicable" includes "feasibility *in a given situation*," Black's Law Dictionary (12th ed. 2024) (emphasis added), and not merely "capable of being accomplished" but "*reasonably*" so. *Id.*  Petitioners' definition would strip "practicable" of this essential nuance, which distinguishes the words.  Congress chose "practicable" not "feasible," and EPA's superior interpretation of TSCA honors that choice.

Second, Petitioners' approach conflicts with the way courts have interpreted "practicable" in other contexts, where "rarely is it used to focus solely on technical feasibility." 2020 RTC at 26, 2-ER-0111.  For example, in *Union Neighbors United, Inc. v. Jewell*, the D.C. Circuit upheld an agency's interpretation of "maximum extent practicable" to include more than technical feasibility alone. 831 F.3d 564, 583-84 (D.C.

Cir. 2016). In that case, the Fish and Wildlife Service interpreted the Endangered Species Act to allow consideration of lost revenues, reductions in clean energy, and loss of emissions reductions, notwithstanding the statute's requirement that the endangered Indiana bats be protected "to the maximum extent practicable." *Id.* As here, challengers to the regulation argued that "maximum extent practicable" removed the agency's discretion to weigh economic and other downsides against protecting the bat population. *Id.* The court rejected that overly narrow interpretation. *Id.* This Court should do the same.

Indeed, it is telling that the *only* case Petitioners cite to support their restrictive definition of "practicable" doesn't consider the definition of "practicable" at all. *See* Pet'rs' Br. at 32. Petitioners concede that in *American Textile Manufacturers Institute v. Donovan*, the Supreme Court interpreted "feasible" to mean "capable of being done, executed, or effected"—not "practicable." *See id.* Petitioners rely on their assertion that feasible and practicable are "synonyms" in a failed attempt to convert *Donovan* into an interpretation of "practicable." *Id.* But synonyms may not be interchanged willy-nilly. To hold otherwise would rewrite TSCA to read "feasibility alone" rather

29

than "feasible *in a particular situation*," "*reasonably* capable of being accomplished," or simply "practicable." *See e.g.*, Black's Law Dictionary (12th ed. 2024).

Having failed to persuasively interpret the plain meaning of the statute or to support that interpretation with relevant case law, Petitioners next search in the legislative history for support. They do not find it.

Petitioners assert that Congress "intended 'to the extent practicable' in [15 U.S.C. § 2605](h)(4) to mean to the '*maximum* extent practicable.'" Pet'rs' Br. 33 (citing 162 Cong. Rec. 7984 (2016)). They support this claim by noting that the Senate version of the bill contained in various places requirements that actions be taken to "the maximum extent practicable" while the House version merely stated "to the extent practicable." *Id.* Petitioners apparently believe that Congress' explicit decision *not* to include the word "maximum" when drafting "extent practicable" in the final bill somehow evinces its intent to include it because Petitioners hypothesize the House Legislative Counsel "believed" the two phrases "are synonymous." *Id.*

30

This argument is illogical. At the outset, Petitioners' assertion that the *absence* of a word Congress explicitly considered for inclusion in a statute somehow demonstrates the *presence* of that same word lurking in the text's penumbra is contradictory at best. Moreover, Petitioners' assertion that legislative staff must have *believed* "maximum extent practicable" meant the same thing as "the extent practicable" is unsupported and unsupportable. *Id.*

First, even Petitioners do not believe the two phrases mean the same thing, otherwise they would not so strenuously urge the Court to rewrite the statute to include "maximum." *See id.*

Second, if Petitioners are urging the Court to accept that "extent practicable" and "maximum extent practicable" are *in fact* synonymous, it is entirely unclear how this would support Petitioner's preferred definition of "practicable" as synonymous with "feasible." Petitioners try unsuccessfully to have it both ways: Congress *really* meant "maximum extent," but Congress also believes that "maximum extent" and plain "extent" are the same thing, rendering "maximum" superfluous. In any event, the language Congress actually enacted controls. "[N]o amount of guesswork about the purposes behind

legislation can displace what the law's terms clearly direct. '[L]egislative history is not the law.'" *Martin v. United States*, 145 S. Ct. 1689, 1699-700 (2025) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018)); *see also Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators.").

Third, even if Congress had written the statute to require the EPA to reduce exposure to decaBDE to "the maximum extent practicable," that would not support Petitioners' contention that Congress intended the statute to mean "to the maximum extent *feasible*," with no consideration beyond the technical ability to accomplish the reduction. *See* Pet'rs' Br. 33. As already discussed, the D.C. Circuit in *Jewell* has already interpreted the phrase "maximum extent practicable" to allow agencies to consider factors beyond mere technical feasibility. 831 F.3d at 583-84.

Finally, Petitioners assert that EPA should not look to Section 2605(c)(2) factors when selecting restrictions under Section 2605(h)(4). They argue that the other "standard" rules issued under 2605(a) are

32

meant to "eliminate 'unreasonable' risks." Pet'rs' Br. 35. In contrast, they say, Section 2605(h) rules must simply "address the risks" and "'reduce exposure . . . the extent practicable' without regard to the Section [2605](c)(2) consideration or any other factors." *Id.* But this ignores the fact that subsection (h) explicitly requires EPA to "promulgate a final rule under (a)," which in turn explicitly requires that the rule be "in accordance with subsection (c)(2). 15 U.S.C. § 2605(a)(1)-(3), (h)(3).

Additionally, this criticism flows from Petitioners' inferior interpretation of "practicable" and requires a complete disregard for the plain language of the statute otherwise requiring application of Section 2605(c)(2). They would prefer that Congress had merely used "feasible" in Section 2605(h), which is why their interpretation has removed "*reasonably*" from "reasonably capable of being accomplished" and "*in a given situation*" from "feasible in a given situation." But, as explained above, the correct interpretation of "practicable" includes a consideration of reasonableness, requiring the agency to consider factors like economic consequences. *See supra* § I.A. Using the correct interpretation of "practicable" in Section 2605(h) makes consideration of

33

the Section 2605(c)(2) factors perfectly appropriate and consistent in the statutory context.

EPA has always maintained that the definition of "practicable includes feasibility." 2020 RTC at 26, 2-ER-0111. "But [it] also includes what is reasonable in light of the circumstances" and "done or brought to fruition without unreasonable demands." *Id.* EPA's definition is superior because it takes more than mere feasibility into account. After all, "had feasibility alone been intended, Congress could have used that term and directed the agency not to consider the reasonableness of a technically feasible option or of (c)(2) at all." *Id.*

## II. EPA's decision to issue a broad production, import, and processing ban on decaBDE, while declining to fabricate and impose an entirely new disposal and recycling regime, was lawful.

### A. The recycling exclusion is supported by substantial evidence.

#### 1. EPA made a thorough examination of existing information to reach the conclusion that identifying and segregating plastic containing decaBDE would be impracticable.

EPA's decision that banning recycling of plastics containing decaBDE would not be practicable was based on substantial evidence in

the record when taken as a whole. For this reason, its decision to exclude recycling operations from its general prohibition was lawful under TSCA.

EPA's principal reason for finding a recycling prohibition impracticable rests on the difficulty of identifying decaBDE-containing articles in recycling streams. 86 Fed. Reg. at 889, 1-ER-0111. Without a reliable and affordable means to identify and separate such articles, recyclers all over the country would have no reasonable ability to comply with the prohibition.

To support EPA's concerns with the costs of testing, EPA referenced an analysis of specific laboratory costs for testing of articles and an analysis done by another agency tasked with monitoring consumer products. Econ. Anal. Final Reg. DecaBDE, at 4-12 (Dec. 16, 2020), 2-ER-0222 ("Economic Analysis"). In the first case, EPA summarized the costs for testing articles based on a "pricing list for a laboratory that provides testing of articles to support compliance with Federal regulations including TSCA." *Id.* This analysis was used to support EPA's cost considerations regarding testing of articles in previously issued TSCA rules. *See, e.g.*, 85 Fed. Reg. 45109 (Jul. 27,

35

2020) (Ref. 31); 84 Fed. Reg. 17345 (Apr. 25, 2019) (Ref. 27). EPA found

the range of cost to test articles to vary from $21 to $739 per article, for

an average $128 per article. *Id.* In the 2021 rulemaking, EPA

concluded given this cost "and the wide range of products that would

need to be tested [to identify decaBDE-containing products], this testing

cost is likely to be very high." *Id.*

EPA also considered other available data to try and extrapolate

the overall cost for such testing. *Id.* Specifically, EPA found a heuristic

in an analysis conducted by the Consumer Product Safety Commission

(CPSC) relating to testing children's products for the presence of lead

and phthalate. *Id.* That analysis was based on two CPSC references

assessing test costs and EPA summarized the annual costs:

| Table 4-32: Preliminary Annual Cost Estimate for Children's Product Testing | | | |
|---|---|---|---|
| Product | Number of Products | Test Cost Low (at $50 per product) | Test Cost High (at $350 per product) |
| Non-apparel children's products | 300,000 | $15,000,000 | $105,000,000 |
| Children's apparel and footwear | 1,300,000 | $65,000,000 | $455,000,000 |
| **Total** | **1,600,000** | **$80,000,000** | **$560,000,000** |
| Sources: U.S. Consumer Product Safety Commission (2011, 2018) | | | |

*Id.* at 4-14, 2-ER-0224. These testing costs had a cost range of $50 to

$350 per article, within the range identified by EPA in its analysis for

other TSCA rules. And, while EPA "intended [the CPSC analysis] to be

36

illustrative only," the findings "reinforced EPA's conclusion that the costs of testing products for decaBDE could be very high." *Id.* This is so because the CPSC analysis targeted only children's products whereas the testing for recycling would not be so limited. If EPA were to regulate recycling, a recycling facility would need to test *all* plastic materials received for recycling—those that might have been originally made with decaBDE and all products containing recycled plastic. Additionally, the CPSC analysis, unlike testing in the recycling context, did not need to distinguish decaBDE from other brominated chemicals, and thus required less advanced testing. *Id.* Such costs could potentially dwarf even the CPSC's high estimate of $560,000,000.00.

Given these estimated testing costs, EPA reasonably found that an approach requiring or relying on testing to be impracticable. EPA's decision was bolstered by its finding that "these articles typically contain low levels of decaBDE" and that due to the rulemaking's "significant prohibitions" on all future manufacture, importation, processing, and distribution in commerce of decaBDE, EPA reasonably expected "the amount of recycled plastic that contains decaBDE from

37

recycled plastic to significantly decline over time." 86 Fed. Reg. at 889, 1-ER-0011.

### 2. Petitioners' second-guessing of EPA's recycling analysis is fatally flawed.

Petitioners criticize EPA's analysis of recycling in four ways. They all fail. First, they claim that EPA's "general rejection" of the practicability of recycling was completely unsupported by "cost information." Second, they assert that EPA "offered no rational response" to data submitted by Petitioners and other commentors showing that segregation of decaBDE-containing plastic "is feasible at industrial scale." Third, they claim that EPA's assertion that "decaBDE is typically present … at low levels" in recycled-content articles is "unsubtantiated." Lastly, they say that EPA relied on "policy considerations" not permitted by TSCA when it found prohibiting decaBDE recycling impracticable.

*First*, the assertion that EPA's decision is not supported by cost data is simply false. As explained in the previous section, EPA considered available testing technology to determine whether the costs of testing for the presence of decaBDE would be reasonable. *Supra* § II.A.1. If Petitioners' contention is that EPA erred in failing to "cite"

38

such data in the portion of the preamble that discusses its recycling decision, such criticism misunderstands EPA's rulemaking requirements. EPA cited and reviewed cost information regarding testing for decaBDE in its Economic Analysis of the final 2021 rule. Economic Analysis at 4-13, 2-ER-0223. TSCA's judicial review provision requires only that the final rule be supported by "substantial evidence in the rulemaking record taken as a whole." 15 U.S.C. § 2618(c)(1)(B)(i)(I). EPA is not required to cite such evidence directly in the rule's preamble, and Petitioners offer no support suggesting otherwise.

*Second*, turning to Petitioners' claim that EPA ignored data provided by themselves and other commenters showing that segregation of decaBDE-containing plastic is "feasible at an industrial scale," this assertion is both misleading and incorrect. First, Petitioners pointed to no support for this claim. Rather, they merely pointed to articles describing the segregation of plastics containing brominated flame retardants generally or a class of brominated flame retardants—not segregation of decaBDE plastics alone. Pet'rs' Br. at 37 (citing 7-ER-1462; 4-ER-0743; 4-ER-0585; 7-ER-1493; 9-ER-1975, 1980–84, 1998–

2003, 2009–14). But EPA explained that segregation techniques used in those references "cannot easily distinguish between brominated flame retardants, or between polybrominated diphenyl ether (PBDE) congeners," *i.e.* they could not isolate decaBDE plastics. 2020 RTC at 56, 2-ER-0141. This means that while Petitioners did present evidence that recyclers may be able to segregate *all* PBDE-containing plastics from other articles, such procedures would over-include articles that do not contain decaBDE. *See id*.

Similarly, Petitioners' claim that "the European Union is capable of separating plastics containing brominated flame retardants" or that there are "systems that separate plastics with high bromine content" is of no moment. TSCA did not authorize EPA to analyze and regulate the entire class of brominated flame retardants or PDBEs on an expedited basis under section 2605(h); the Act required EPA to focus on chemical substances like decaBDE that meet the specific criteria for "expedited action." 15 U.S.C. § 2605(h)(1).

Indeed, these same references confirm the difficulty of identifying decaBDE specifically as compared to other brominated chemicals. *See* 7-ER-1462; 4-ER-0743; 4-ER-0585; 7-ER-1493; 9-ER-1975, 1980–84,

40

1998-2003, 2009–14. Neither did other commenters identify a practicable approach for identifying decaBDE-containing materials. Rather, commenters urged EPA to ignore any "difficulty in distinguishing among [PBDE] congeners through testing," 2020 RTC at 60, 1-ER-0145, because "EPA should not limit itself to examining only decaBDE when PBDEs generally raise the same concerns." Comment of the City of New York at 13, SER-16. But notably, PBDEs other than decaBDE are outside the scope of this rule. In short, neither Petitioners nor other commenters pointed to evidence showing that segregating *decaBDE-containing plastics* is "feasible" at an industrial scale, much less practicable.[3] And EPA explained that methods which may distinguish decaBDE are cost prohibitive. Economic Analysis at 4-13, 2-ER-0223.

---

[3] EPA did consider that "advanced mass-spectrometric methods" are available and "give precise information about the quantities of [decaBDE]BDE-209 in a matrix" and that this equipment is "not the standard method used by waste treatment and recycling companies which typically rely on cruder sorting methods based on total bromine content for screening and sorting … Advanced analytical technologies are not available to the waste management sector on an industrial scale." 6-ER-1327 **(**POPs Report, referencing UNEP/POPS/POPRC.6/2/Rev.1).

41

*Third*, Petitioners' assertion that EPA failed to substantiate its claim that "decaBDE is typically present . . . at low levels" in articles is incorrect. *See* Pet'rs' Br. 42-43. The 2015 Norwegian report EPA referenced in its 2021 Proposed Rule for this proposition provides a summary of numerous studies sampling a variety of products and articles for various BDEs, including decaBDE. "Literature Study-DecaBDE in Waste Streams," Norwegian Environmental Agency, Final Report (Dec. 11, 2015), 4-ER-00513 ("Norwegian Report"). In some cases, these studies identify the chemical content as "low," "very low," or not detected. *See* 4-ER-0540 (chart rows for refrigerators, white goods, small domestic appliances showing "n.d." for not detected); 4-ER-0547 ("the average levels in these waste streams resulting from construction and demolition are probably usually very low"); 4-ER-0549 (same); 4-ER-0568 ("DecaBDE is contained at low levels in ASR (0.2 to 70 mg/kg) and was detected at more significant levels in mixed SR (6 to 819 mg/kg). Moreover, decaBDE was detected at low levels (6.4 to 40 mg/kg) in SR from one E-waste company (3 samples with generally very low levels of BDEs) but it was consistently detected at high levels (550 to 3300 mg/kg) in SR from another E-waste plant (9 samples).") In other

42

cases, actual levels are reported. *See* 4-ER-0539 (Table 3). Petitioners focus on one study in which a single toy was identified as containing 4,232 mg/kg decaBDE, which they claim demonstrates the concentrations in "toys that were tens of thousands of times higher" than decaBDE concentrations in recycled carpet padding and other foam. Pet'rs' Br. at 43. However, this was an outlier. The median concentration of decaBDE in the toys tested was 34.3 mg/kg, or 0.0034% percent by weight—well under the 0.1% *de minimis* threshold for regulation, and thus levels in these articles are *typically* low. 4-ER-0577 ("DecaBDE had the highest concentration of 4232 mg/kg, with a median value of 34.3 mg/kg.") [4]

---

[4] Table 3 of the 2024 Liu reference cited by Petitioners shows that, even as to the set of articles selected by the authors as likely to contain BDEs, the median concentration of decaBDE was 103 mg/kg, or 0.01% by weight. 7-ER-1573, Table 3. The median concentration is 10 times lower than the *de minimis* threshold EPA set in the rule. 89 Fed. Reg. at 91509, 1-ER-0040. The 2024 amendments adopted an exclusion for levels of decaBDE present unintentionally in a product or article if below 0.1% by weight, and Petitioners do not challenge this regulation. 40 C.F.R. § 751.405(a)(1)(ii). This is similarly the case for the levels found in the 2018 Strakova study Petitioners cite. 5-ER-0992–97. The executive summary states that samples containing decaBDE were at concentrations ranging from 1 to 3,310 parts per million, which translates to 0.0001% to 0.3310% decaBDE by weight. *Id.* Only 9 of the 430 products scanned were above the 0.1% regulatory threshold EPA adopted in 2024 to aid in compliance. *Id.*

Moreover, and most importantly, the article frequently noted that levels were declining and *were expected to continue to decline*. Norwegian Report at 16, 4-ER-0528. This is because, at the time of publication of the article, there were already existing voluntary phase-outs on production and use of decaBDE, including in the United States, and mandatory controls already existing for other brominated chemicals under the Stockholm Convention. Norwegian Report at 11-13, 46, 4-ER-0523–25, 0558.

Notably, all of these summaries were for studies produced over a decade ago, reflecting samples that were taken in many cases well over two decades prior to publication of the article—before some international voluntary phase-outs had been adopted, before global action was taken on decaBDE, and before EPA's 2021 rulemaking adopting a broad ban on manufacture and processing of decaBDE. Norwegian Report at 20, 41, 4-ER-0532, 0553. Thus, there is support in the record for EPA's conclusions that to the extent decaBDE is present in recycled plastic articles, it has typically been present at very low levels that are expected to decline, and that it would be impracticable to

regulate recycling to reduce the potential for exposures to these low levels, given the high costs for testing.

*Fourth*, Petitioners' argument that EPA considered an impermissible policy preference—the impact of regulation of decaBDE in plastics recycling on that industry—to the detriment of its Section 2605 mandate, is incorrect. TSCA explicitly requires EPA to consider "the likely effect of the rule on the national economy, small business, technological innovation, the environment, and public health." 15 U.S.C. § 2605(c)(2)(A)(iv)(I). EPA's consideration of the effect of decaBDE regulation on the plastic recycling industry is simply part of EPA's analysis of this mandatory consideration.

EPA logically determined that without a cost-effective means for distinguishing decaBDE-containing plastics from all other plastics bound for recycling, regulating decaBDE in plastic recycling would have massive negative impacts on the entire recycling industry. 2024 RTC at 6, 6-ER-1355; *see also* 2020 RTC at 62, 2-ER-0147. EPA considered that recycling of plastics is linked to several benefits, both environmental and economic. 86 Fed. Reg. at 889, 1-ER-0011 ("EPA recognizes the importance and impact of recycling, which contributes to American

45

prosperity and the protection of our environment."). Such analysis supports EPA's entirely proper determination that segregating decaBDE-containing plastics from the recycling stream would be impracticable. *Supra*, § II.A.1. And practicability is the standard that Congress chose in TSCA.

### B. EPA's decision to rely on its existing disposal regime—including for wastewater and sewage sludge—is reasonable.

All three of Petitioners' remaining claims stem from their contention that EPA improperly relied on EPA's existing disposal regime to address potential for exposure to decaBDE or decaBDE-containing materials when they are manufactured, processed, or distributed for purposes of disposal, including through wastewater and sewage sludge. Pet'rs' Br. § III. Petitioners' arguments regarding all types of disposal fail for two main reasons. First, EPA's determination that the immediate imposition of a new TSCA disposal regime for decaBDE would be impracticable was based on substantial evidence. Second, Petitioners fail to demonstrate that section 2605(h)(4) precludes consideration of existing disposal regimes under this approach. EPA is not required to immediately set standards to attain the lowest degree of

decaBDE exposure *possible*. It may only do what it did: reduce exposures to the extent EPA determined was practicable at that time.

###### 1. EPA's determination that its broad prohibitions and existing disposal regimes reduced DecaBDE exposure to the extent practicable was based on substantial evidence.

Federal and state laws other than TSCA provide comprehensive regulation of disposal—including disposal of wastewater and usage of sewage sludge—such that *additional* regulation of decaBDE via TSCA in these contexts is not practicable, particularly as overall levels of decaBDE decline. The 2021 final rule imposed a broad prohibition on manufacturing, processing, and commercially distributing decaBDE and decaBDE-containing products and articles wherever such prohibition was practicable. EPA reasoned that these prohibitions would ultimately (i) significantly and immediately reduce the potential for new decaBDE entering commerce; (ii) further reductions would necessarily result from voluntary phase-outs; (iii) and both such reductions would, over time, reduce the amounts managed in waste. 86 Fed. Reg. at 886, 888, 891, 1-ER-0008,0010, 0013. EPA thus reasoned that already existing federal and state controls on waste management,

combined with the broad prohibition on manufacture, processing, and commercial distribution would reduce potential for exposures from disposal activities to the extent practicable.  86 Fed. Reg. at 886, 888, 1-ER-0008, 0010.

*Landfills*

Taking into account the broad prohibitions adopted, EPA found that the Resource Conservation Recovery Act (RCRA) provides an existing disposal regime that already reduces decaBDE exposure from landfills to the extent practicable, and thus additional regulation was not necessary.  "EPA generally presumes compliance with federal and state laws and regulations, including, for example, [RCRA]."  86 Fed. Reg. at 886, 1-ER-0008.  Specifically, EPA noted that RCRA regulates disposal at municipal solid waste landfills, including "location restrictions, composite liners, leachate collection and removal systems, operating practices, groundwater monitoring, closure and post-closure care, corrective action provisions, and financial assurance."  *Id.*  EPA further noted that "states generally play a lead role in ensuring that the federal requirements are met" and that "[i]ndustrial waste (non-hazardous) landfills and construction/demolition waste landfills are

48

primarily regulated under state regulatory programs, and in addition they must meet the criteria set forth in federal regulations" under RCRA.  2020 RTC at 36, 2-ER-0121; 2024 RTC at 5, 6-ER-1354.[5]  EPA thus concluded that given "this comprehensive, stringent program for addressing disposal," "it is not practicable to impose additional requirements under TSCA on the disposal of the PBT chemicals, including decaBDE" where doing so "would be expensive and difficult to establish and administer."  86 Fed. Reg. at 886, 1-ER-0008; 2020 RTC at 61, 2-ER-0145.

*Wastewater*

In the 2024 Amendments, EPA added a prohibition for releases of decaBDE to water during manufacture, processing, and distribution of decaBDE and decaBDE-containing products.  89 Fed. Reg. at 91497, 1-ER-0028.  EPA found that looking to the most recent data from 2021

---

[5] The decaBDE rule at issue here has no preemptive effect on state actions under TSCA section 18.  *See* 2020 RTC at 16, 2-ER-0101; *see also* TSCA section 18(a)(1)(B)(i) (preemption results from a TSCA section 6(a) rule only if preceded by a risk evaluation under TSCA section 6(b)(4)).  Therefore, EPA's concern that regulating disposal to landfills under TSCA would cause confusion with overlapping state regulatory programs is heightened here, because such TSCA regulation would exist *alongside* state regulations—including those under RCRA—and not over them.

showing that there were "zero releases of decaBDE to water," *id.* at 91498, 1-ER-0029, EPA imposed the prohibition as an anti-backsliding provision. 2024 RTC at 14-15, 6-ER-1363–64.

However, EPA did not impose specific release prohibitions for wastewater treatment plants "unless those facilities are manufacturing, processing, or distributing decaBDE or decaBDE-containing products." EPA reasoned that "disposal requirements that would effectively require wastewater treatment plants to test" for decaBDE would be impracticable. 2024 RTC at 47, 6-ER-1396; *and see* 89 Fed. Reg. at 91495, 1-ER-0026 and 2024 RTC at 14-15, 6-ER-1363–64. As noted, *supra* § II.A.1., the record before EPA indicated that the analytical technologies to distinguish decaBDE as compared to other BDEs "are not available to the waste management sector on an industrial scale" and testing would be quite expensive. 6-ER-1327.

*Sewage Sludge*

EPA also declined to regulate decaBDE in the use of biosolids or sewage sludge. Biosolids and sewage sludge are themselves an output of wastewater treatment plants, thus just as with the wastewater coming out of wastewater treatment plants, EPA determined that

50

regulating decaBDE in biosolids and sewage sludge "would effectively require wastewater treatment plants to test for [decaBDE] and install treatment technologies to remove [it]." 2024 RTC at 47, 6-ER-1396.

Substantial evidence supported EPA's decision that additional disposal regulation in all three contexts beyond the already existing regulatory schemes was impracticable. Notably, the record contains scant evidence that regulation of decaBDE disposal activities would even be feasible, much less practicable. The evidence in the record for the 2021 rulemaking demonstrated that the combination of the broad prohibitions adopted in the 2021 final rule and the existing disposal regimes under RCRA would already reduce potential exposures from disposal to the extent practicable. 86 Fed. Reg. at 886, 1-ER-0008.

> **2. Petitioners fail to demonstrate that regulation of disposal, including wastewater and sewage sludge, is practicable.**

Petitioners disagree with EPA's disposal decision, asserting that certain releases of decaBDE to the environment from disposal in landfills, certain discharges to wastewater, and land application of sewage sludge remain possible after the final rule. Pet'rs' Br. 47-68. While such releases might still occur, total prohibition is not the

51

standard. EPA may only reduce exposure "to the extent practicable."

15 U.S.C. § 2605(h)(4).

*Landfills*

Petitioners also assert that RCRA does not adequately protect

rural Alaskans because "RCRA allows waste burning to occur at rural

Alaskan landfills in non-incinerator structures that lack any emissions

controls" and "allows landfills serving Alaskan Native villages and

other small rural communities to operate without protective features

like liners, leachate collection systems, or groundwater monitoring."

Pet'rs' Br. At 53-54; *see also* 2020 RTC at 37, 2-ER-0122. But regulation

of disposal in these areas already has been determined to be infeasible.

EPA responded during the 2024 rulemaking that RCRA permits the

state of Alaska to exempt certain disposal areas and practices from

regulation where to do so would be "infeasible, would not be cost-

effective, or would be otherwise inappropriate because of the remote

location of the unit." 2020 RTC at 37, 2-ER-0122. Where such

determinations have been made, EPA reasonably adopted the already

existing determination that "imposing regulatory standards for such

disposals is not practicable." *Id.* This exemption in RCRA expresses

Congress' determination that "the RCRA Subtitle D program is not always feasible or practicable for the small landfills covered by the Act, and the additional flexibility provided by the Act is therefore necessary and appropriate," supporting the impracticability of imposing regulatory standards for such disposals, particularly for remote areas. 2020 RTC at 37, 2-ER-0122.

Petitioners complain that the current RCRA exemption was invoked by Alaska's governor in 1999 and therefore cannot be relied upon for a TSCA practicability determination because it was made under RCRA and years before the TSCA rulemaking. Pet'rs' Br. 55-56. But Petitioners fail to show that the mere passage of time makes the RCRA exemption for remote areas invalid. EPA reasonably determined that if Congress permitted RCRA exemptions where more stringent regulation was impracticable, such conditions would also make additional TSCA regulation of landfills impracticable.

*Wastewater*

Petitioners charge that EPA should have regulated recycling facilities and wastewater treatment plants to prohibit wastewater discharges that might contain decaBDE. Pet'rs' Br. 56-62. But

Petitioners fail to apprehend that the record does not contain evidence that testing for the presence of decaBDE is practicable at an industrial scale.  Instead, Petitioners rely on their incorrect "feasible" standard to conclude that if a testing method is technically possible, it is therefore practicable to require all wastewater treatment plants, recycling facilities, commercial and industrial laundries, and other industrial facilities to test for the presence of and remove decaBDE from wastewater.  *See id.*  Instead, EPA applied the correct interpretation of practicable to determine that such testing would cost-prohibitive.  *See supra* § II.A.1.

*Sewage Sludge*

Petitioners argue, however, that testing is "feasible" for regulating sewage sludge and has been done for decaBDE as part of an EPA National Sewage Sludge Survey ("NSSS").  Pet'rs' Br at 66 (citing 6-ER-1207).  But the NSSS is a resource-intensive study that has only occurred 3 times in the last forty years, with the most recent survey being completed in 2006.[6]  And the NSSS utilizes testing that is not

---

[6] *Available at* https://www.epa.gov/biosolids/sewage-sludge-surveys#nextNSSS

done at an industrial scale, requiring "taking samples from each individual piece of plastic, sending the samples to a lab, and assaying for [the substance] via gas chromatography/mass spectrometry [which] is not feasible for even a small number of plastic items being recycled per day." 2024 RTC at 38, 6-ER-1387.[7] Thus, the fact that a testing methodology might be *possible* does not mean that it is *practicable* under the section 2605(h)(4) standard for reducing exposures. And the record before EPA did not provide support for that finding, particularly as to the cost of identifying decaBDE in the waste stream on an industrial scale. *See supra* § II.B.1. Moreover, the document referenced by Petitioners discussing the Survey, EPA's 2010 Exposure Assessment of Polybrominated Diphenol Ethers, identifies the mean concentration of decaBDE in all samples to be 2,181.23 ug/kg, which translates to 0.00022% by weight, which is below the current *de minimis* regulatory threshold for regulating decaBDE. 6-ER-1223, Table 3-8.[8]

---

[7] This response detailed the difficulty of testing recycled plastic for PIP, but the same difficulties are present when testing for the presence of decaBDE.

[8] The relevant data is listed in Table 3-8 in the column for "BDE 209," *id.,* which is a synonym for decaBDE. *See* 3-ER-0305.

EPA thus reasonably decided that the broad prohibitions it adopted and the existing disposal regimes provided practicable exposure reductions, but that additional regulation was not practicable under the circumstances.

### C. Under *Bluewater*, EPA is authorized to evaluate in stages.

Even if Petitioners are correct that other disposal regimes fail to regulate decaBDE to the extent practicable, this petition still should be denied because EPA may regulate the chemical in stages. EPA reasonably focused first primarily on reducing the potential for new decaBDE entering commerce, phase-outs, and restrictions on releases to water, leaving plastic recycling and disposal to potentially be regulated at a later time. Even where a statute is "technology forcing" and requires EPA to set standards to "achieve the greatest degree of emission reduction achievable" by a statutory deadline, Courts have found a staged approach permissible. *Bluewater Network v. EPA*, 372 F.3d 404, 406, 411 (D.C. Cir. 2004); *see also*, *So. Coast Air Quality Mgmt Dist. v. EPA*, 554 F.3d 1076, 1080 (D.C. Cir. 2009) (upholding EPA's decision to meet its statutory mandate through a regulation that prevents backsliding while it considers longer-term standards).

56

In *Bluewater*, EPA set emissions standards for nonroad engines and vehicles in two stages. *Id.* at 408. The first stage imposed "Tier 1 emissions standards" that track existing standards that "manufacturers are generally already meeting" voluntarily, i.e., an "anti-backsliding" provision. *Id.* at 408, 412. EPA also stated that it would consider Tier 2 standards at a later date, where it would "consider the state of technology that may permit deeper emission reductions and the status of international action for more stringent standards." *Id.* Environmental group petitioners argued that the Tier 1 standards were "simply an iteration of the status quo and effect no reduction in emissions," and that the potential Tier 2 standards "cannot save the rule . . . because the EPA has not even committed to stricter Tier 2 standards." *Id.* at 410. The D.C. Circuit disagreed, finding that even though adopting stricter standards immediately might result in reduced emissions, "the Statute . . . intends [EPA] to consider many factors other than pure technological capability, such as costs, lead time, safety, noise and energy." *Id.* at 411.

In this case, EPA made a similar determination based on a similar statutory structure. In the 2021 Rule, EPA focused primarily on a

broad prohibition on the manufacture and processing of new decaBDE. EPA also found that it was not practicable to use a similar approach for recycling, disposal and related activities. Yet, EPA noted that it "may review these particular practicability determinations in the future." 86 Fed. Reg. at 888, 1-ER-0010.

Consistent with this position, in the 2024 Amendments, EPA determined it would be practicable to prohibit releases to water during the manufacture, processing, or distribution in commerce of decaBDE and decaBDE products. 89 Fed. Reg. at 91497-98, 1-ER-0028–29. However, EPA explained that it was not implementing a broad "regulatory program for disposal . . . *at this time*." 2024 RTC at 7, 6-ER-1356. EPA noted that it "remains concerned that developing a new comprehensive regulation for disposal of decaBDE  . . . under [15 U.S.C. § 2605(h)(4), in addition to the existing requirements under RCRA (*e.g.,* those for non-hazardous solid waste, industrial waste), is not practicable." 89 Fed. Reg. at 91495, 1-ER-0026.  EPA reiterated its concern from the 2021 rulemaking that treating waste that might contain decaBDE "as if they were hazardous waste would have impacts on hazardous waste disposal capacity and be very expensive for States

and local governments as well as for affected industries." *Id.* Similarly, EPA explained in the 2024 amendments that it "did not reevaluate the practicability of further exposure reductions relating to . . . the general recycling of decaBDE- and PIP (3:1)-containing plastic . . . *at this time*." 89 FR 91495, 1-ER-0026 (emphasis added).

EPA's decision that regulating disposal and recycling activities in the 2021 or 2024 rulemakings was not practicable and to defer potential regulation of disposal and recycling activities to future rulemakings is entirely consistent with court's ruling in *Bluewater*, where EPA found that a full consideration of the circumstances rendered immediate regulation impracticable.

## III. Remedy

Petitioners assert that this Court should remand the challenged rule to EPA without vacatur. Pet'rs' Br. at 69. If the Court is inclined to remand this rule to EPA for further consideration, EPA agrees that it should do so without vacatur.

## CONCLUSION

For the foregoing reasons, the petitions for review should be denied.

59

Respectfully submitted,

/s/ *Redding Cofer Cates*
ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

Of Counsel:

AMBER ARANDA
STEPHANIE SCHWARZ
*Attorneys*
U.S. Environmental Protection
Agency

September 30, 2025
DJ # 90-5-1-7-22861

REDDING COFER CATES
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-5561
redding.cates@usdoj.gov

60

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of the Ninth Circuit Rule 32-1 because it contains 10,906 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

I also certify that this brief complies with the type face and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced font using Microsoft Word Century Schoolbook 14-point font.

**Signature**  <u>s/ Redding Cofer Cates</u>

**Date**   September 30, 2025

No. 24-7497
Consolidated with Nos. 21-70168, 21-70670

———————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

YUROK TRIBE, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

———————————————

On Petitions for Review of Actions of the
U.S. Environmental Protection Agency

———————————————

**RESPONDENTS' STATUTORY AND REGULATORY
ADDENDUM**

———————————————

Of Counsel:

AMBER ARANDA
STEPHANIE SCHWARZ
*Attorneys*
U.S. Environmental Protection
Agency

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
REDDING COFER CATES
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-5561
redding.cates@usdoj.gov

# TABLE OF CONTENTS

15 U.S.C. § 2617 .......................................................................ADD001

United States Code Annotated
 Title 15. Commerce and Trade
  Chapter 53. Toxic Substances Control (Refs & Annos)
   Subchapter I. Control of Toxic Substances (Refs & Annos)

15 U.S.C.A. § 2617

§ 2617. Preemption

Currentness

**(a) In general**

**(1) Establishment or enforcement**

Except as otherwise provided in subsections (c), (d), (e), (f), and (g), and subject to paragraph (2), no State or political subdivision of a State may establish or continue to enforce any of the following:

**(A) Development of information**

A statute or administrative action to require the development of information about a chemical substance or category of chemical substances that is reasonably likely to produce the same information required under section 2603, 2604, or 2605 of this title in--

**(i)** a rule promulgated by the Administrator;

**(ii)** a consent agreement entered into by the Administrator; or

**(iii)** an order issued by the Administrator.

**(B) Chemical substances found not to present an unreasonable risk or restricted**

A statute, criminal penalty, or administrative action to prohibit or otherwise restrict the manufacture, processing, or distribution in commerce or use of a chemical substance--

**(i)** for which the determination described in section 2605(i)(1) of this title is made, consistent with the scope of the risk evaluation under section 2605(b)(4)(D) of this title; or

**(ii)** for which a final rule is promulgated under section 2605(a) of this title, after the effective date of the rule issued under section 2605(a) of this title for the chemical substance, consistent with the scope of the risk evaluation under section 2605(b)(4)(D) of this title.

**(C) Significant new use**

A statute or administrative action requiring the notification of a use of a chemical substance that the Administrator has specified as a significant new use and for which the Administrator has required notification pursuant to a rule promulgated under section 2604 of this title.

**(2) Effective date of preemption**

Under this subsection, Federal preemption of statutes and administrative actions applicable to specific chemical substances shall not occur until the effective date of the applicable action described in paragraph (1) taken by the Administrator.

**(b) New statutes, criminal penalties, or administrative actions creating prohibitions or other restrictions**

**(1) In general**

Except as provided in subsections (c), (d), (e), (f), and (g), beginning on the date on which the Administrator defines the scope of a risk evaluation for a chemical substance under section 2605(b)(4)(D) of this title and ending on the date on which the deadline established pursuant to section 2605(b)(4)(G) of this title for completion of the risk evaluation expires, or on the date on which the Administrator publishes the risk evaluation under section 2605(b)(4)(C) of this title, whichever is earlier, no State or political subdivision of a State may establish a statute, criminal penalty, or administrative action prohibiting or otherwise restricting the manufacture, processing, distribution in commerce, or use of such chemical substance that is a high-priority substance designated under section 2605(b)(1)(B)(i) of this title.

**(2) Effect of subsection**

This subsection does not restrict the authority of a State or political subdivision of a State to continue to enforce any statute enacted, criminal penalty assessed, or administrative action taken, prior to the date on which the Administrator defines and publishes the scope of a risk evaluation under section 2605(b)(4)(D) of this title.

**(c) Scope of preemption**

Federal preemption under subsections (a) and (b) of statutes, criminal penalties, and administrative actions applicable to specific chemical substances shall apply only to--

**(1)** with respect to subsection (a)(1)(A), the chemical substances or category of chemical substances subject to a rule, order, or consent agreement under section 2603, 2604, or 2605 of this title;

**(2)** with respect to subsection (b), the hazards, exposures, risks, and uses or conditions of use of such chemical substances included in the scope of the risk evaluation pursuant to section 2605(b)(4)(D) of this title;

**(3)** with respect to subsection (a)(1)(B), the hazards, exposures, risks, and uses or conditions of use of such chemical substances included in any final action the Administrator takes pursuant to section 2605(a) or 2605(i)(1) of this title; or

**(4)** with respect to subsection (a)(1)(C), the uses of such chemical substances that the Administrator has specified as significant new uses and for which the Administrator has required notification pursuant to a rule promulgated under section 2604 of this title.

### (d) Exceptions

#### (1) No preemption of statutes and administrative actions

##### (A) In general

Nothing in this chapter, nor any amendment made by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, nor any rule, standard of performance, risk evaluation, or scientific assessment implemented pursuant to this chapter, shall affect the right of a State or a political subdivision of a State to adopt or enforce any rule, standard of performance, risk evaluation, scientific assessment, or any other protection for public health or the environment that--

**(i)** is adopted or authorized under the authority of any other Federal law or adopted to satisfy or obtain authorization or approval under any other Federal law;

**(ii)** implements a reporting, monitoring, or other information obligation for the chemical substance not otherwise required by the Administrator under this chapter or required under any other Federal law;

**(iii)** is adopted pursuant to authority under a law of the State or political subdivision of the State related to water quality, air quality, or waste treatment or disposal, except to the extent that the action--

**(I)** imposes a restriction on the manufacture, processing, distribution in commerce, or use of a chemical substance; and

**(II)(aa)** addresses the same hazards and exposures, with respect to the same conditions of use as are included in the scope of the risk evaluation published pursuant to section 2605(b)(4)(D) of this title, but is inconsistent with the action of the Administrator; or

**(bb)** would cause a violation of the applicable action by the Administrator under section 2604 or 2605 of this title; or

**(iv)** subject to subparagraph (B), is identical to a requirement prescribed by the Administrator.

##### (B) Identical requirements

###### (i) In general

The penalties and other sanctions applicable under a law of a State or political subdivision of a State in the event of noncompliance with the identical requirement shall be no more stringent than the penalties and other sanctions available to the Administrator under section 2615 of this title.

### (ii) Penalties

In the case of an identical requirement--

(I) a State or political subdivision of a State may not assess a penalty for a specific violation for which the Administrator has assessed an adequate penalty under section 2615 of this title; and

(II) if a State or political subdivision of a State has assessed a penalty for a specific violation, the Administrator may not assess a penalty for that violation in an amount that would cause the total of the penalties assessed for the violation by the State or political subdivision of a State and the Administrator combined to exceed the maximum amount that may be assessed for that violation by the Administrator under section 2615 of this title.

## (2) Applicability to certain rules or orders

### (A) Prior rules and orders

Nothing in this section shall be construed as modifying the preemptive effect under this section, as in effect on the day before the effective date of the Frank R. Lautenberg Chemical Safety for the 21st Century Act, of any rule or order promulgated or issued under this chapter prior to that effective date.

### (B) Certain chemical substances and mixtures

With respect to a chemical substance or mixture for which any rule or order was promulgated or issued under section 2605 of this title prior to the effective date of the Frank R. Lautenberg Chemical Safety for the 21st Century Act with respect to manufacturing, processing, distribution in commerce, use, or disposal of the chemical substance or mixture, nothing in this section shall be construed as modifying the preemptive effect of this section as in effect prior to the enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act of any rule or order that is promulgated or issued with respect to such chemical substance or mixture under section 2605 of this title after that effective date, unless the latter rule or order is with respect to a chemical substance or mixture containing a chemical substance and follows a designation of that chemical substance as a high-priority substance under section 2605(b)(1)(B)(i) of this title, the identification of that chemical substance under section 2605(b)(2)(A) of this title, or the selection of that chemical substance for risk evaluation under section 2605(b)(4)(E)(iv)(II) of this title.

## (e) Preservation of certain laws

### (1) In general

Nothing in this chapter, subject to subsection (g) of this section, shall--

**(A)** be construed to preempt or otherwise affect the authority of a State or political subdivision of a State to continue to enforce any action taken or requirement imposed or requirement enacted relating to a specific chemical substance before April 22, 2016, under the authority of a law of the State or political subdivision of the State that prohibits or otherwise restricts manufacturing, processing, distribution in commerce, use, or disposal of a chemical substance; or

**(B)** be construed to preempt or otherwise affect any action taken pursuant to a State law that was in effect on August 31, 2003.

**(2) Effect of subsection**

This subsection does not affect, modify, or alter the relationship between Federal law and laws of a State or political subdivision of a State pursuant to any other Federal law.

**(f) Waivers**

**(1) Discretionary exemptions**

Upon application of a State or political subdivision of a State, the Administrator may, by rule, exempt from subsection (a), under such conditions as may be prescribed in the rule, a statute, criminal penalty, or administrative action of that State or political subdivision of the State that relates to the effects of exposure to a chemical substance under the conditions of use if the Administrator determines that--

**(A)** compelling conditions warrant granting the waiver to protect health or the environment;

**(B)** compliance with the proposed requirement of the State or political subdivision of the State would not unduly burden interstate commerce in the manufacture, processing, distribution in commerce, or use of a chemical substance;

**(C)** compliance with the proposed requirement of the State or political subdivision of the State would not cause a violation of any applicable Federal law, rule, or order; and

**(D)** in the judgment of the Administrator, the proposed requirement of the State or political subdivision of the State is designed to address a risk of a chemical substance, under the conditions of use, that was identified--

**(i)** consistent with the best available science;

**(ii)** using supporting studies conducted in accordance with sound and objective scientific practices; and

**(iii)** based on the weight of the scientific evidence.

**(2) Required exemptions**

Upon application of a State or political subdivision of a State, the Administrator shall exempt from subsection (b) a statute or administrative action of a State or political subdivision of a State that relates to the effects of exposure to a chemical substance under the conditions of use if the Administrator determines that--

**(A)(i)** compliance with the proposed requirement of the State or political subdivision of the State would not unduly burden interstate commerce in the manufacture, processing, distribution in commerce, or use of a chemical substance;

**(ii)** compliance with the proposed requirement of the State or political subdivision of the State would not cause a violation of any applicable Federal law, rule, or order; and

**(iii)** the State or political subdivision of the State has a concern about the chemical substance or use of the chemical substance based in peer-reviewed science; or

**(B)** no later than the date that is 18 months after the date on which the Administrator has initiated the prioritization process for a chemical substance under the rule promulgated pursuant to section 2605(b)(1)(A) of this title, or the date on which the Administrator publishes the scope of the risk evaluation for a chemical substance under section 2605(b)(4)(D) of this title, whichever is sooner, the State or political subdivision of the State has enacted a statute or proposed or finalized an administrative action intended to prohibit or otherwise restrict the manufacture, processing, distribution in commerce, or use of the chemical substance.

**(3) Determination of a waiver request**

The duty of the Administrator to grant or deny a waiver application shall be nondelegable and shall be exercised--

**(A)** not later than 180 days after the date on which an application under paragraph (1) is submitted; and

**(B)** not later than 110 days after the date on which an application under paragraph (2) is submitted.

**(4) Failure to make a determination**

If the Administrator fails to make a determination under paragraph (3)(B) during the 110-day period beginning on the date on which an application under paragraph (2) is submitted, the statute or administrative action of the State or political subdivision of the State that was the subject of the application shall not be considered to be an existing statute or administrative action for purposes of subsection (b) by reason of the failure of the Administrator to make a determination.

**(5) Notice and comment**

Except in the case of an application approved under paragraph (9), the application of a State or political subdivision of a State under this subsection shall be subject to public notice and comment.

**(6) Final agency action**

The decision of the Administrator on the application of a State or political subdivision of a State shall be--

**(A)** considered to be a final agency action; and

**(B)** subject to judicial review.

**(7) Duration of waivers**

A waiver granted under paragraph (2) or approved under paragraph (9) shall remain in effect until such time as the Administrator publishes the risk evaluation under section 2605(b) of this title.

**(8) Judicial review of waivers**

Not later than 60 days after the date on which the Administrator makes a determination on an application of a State or political subdivision of a State under paragraph (1) or (2), any person may file a petition for judicial review in the United States Court of Appeals for the District of Columbia Circuit, which shall have exclusive jurisdiction over the determination.

**(9) Approval**

**(A) Automatic approval**

If the Administrator fails to meet the deadline established under paragraph (3)(B), the application of a State or political subdivision of a State under paragraph (2) shall be automatically approved, effective on the date that is 10 days after the deadline.

**(B) Requirements**

Notwithstanding paragraph (6), approval of a waiver application under subparagraph (A) for failure to meet the deadline under paragraph (3)(B) shall not be considered final agency action or be subject to judicial review or public notice and comment.

**(g) Savings**

**(1) No preemption of common law or statutory causes of action for civil relief or criminal conduct**

**(A) In general**

Nothing in this chapter, nor any amendment made by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, nor any standard, rule, requirement, standard of performance, risk evaluation, or scientific assessment implemented pursuant to this chapter, shall be construed to preempt, displace, or supplant any State or Federal common law rights or any State or Federal statute creating a remedy for civil relief, including those for civil damage, or a penalty for a criminal conduct.

**(B) Clarification of no preemption**

Notwithstanding any other provision of this chapter, nothing in this chapter, nor any amendments made by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, shall preempt or preclude any cause of action for personal injury, wrongful death, property damage, or other injury based on negligence, strict liability, products liability, failure to warn, or any other legal theory of liability under any State law, maritime law, or Federal common law or statutory theory.

**(2) No effect on private remedies**

**(A) In general**

Nothing in this chapter, nor any amendments made by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, nor any rules, regulations, requirements, risk evaluations, scientific assessments, or orders issued pursuant to this chapter shall be interpreted as, in either the plaintiff's or defendant's favor, dispositive in any civil action.

**(B) Authority of courts**

This chapter does not affect the authority of any court to make a determination in an adjudicatory proceeding under applicable State or Federal law with respect to the admission into evidence or any other use of this chapter or rules, regulations, requirements, standards of performance, risk evaluations, scientific assessments, or orders issued pursuant to this chapter.

**CREDIT(S)**

(Pub.L. 94-469, Title I, § 18, Oct. 11, 1976, 90 Stat. 2038; renumbered Title I, Pub.L. 99-519, § 3(c)(1), Oct. 22, 1986, 100 Stat. 2989; amended Pub.L. 114-182, Title I, § 13, June 22, 2016, 130 Stat. 492.)

Notes of Decisions (8)

15 U.S.C.A. § 2617, 15 USCA § 2617
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.