No. 24-7497
(consolidated with Nos. 21-70168, 21-70670)

# In the United States Court of Appeals for the Ninth Circuit

YUROK TRIBE, ALASKA COMMUNITY ACTION ON TOXICS,
CENTER FOR ENVIRONMENTAL TRANSFORMATION, and
CONSUMER FEDERATION OF AMERICA,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and
LEE ZELDIN, in his official capacity as Administrator of the United States
Environmental Protection Agency,

*Respondents.*

On Petition for Review of Final Agency Actions of the United States
Environmental Protection Agency
86 Fed. Reg. 880 (Jan. 6, 2021) and 89 Fed. Reg. 91,486 (Nov. 19, 2024)

**BRIEF OF iGPS LOGISTICS LLC AS *AMICUS CURIAE*
IN SUPPORT OF RESPONDENTS**

Allon Kedem
Lawrence E. Culleen
Judah Prero
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
allon.kedem@arnoldporter.com

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, iGPS Logistics LLC states that it is a privately held company and that no publicly held corporation owns 10% or more of its stock.

Dated: October 6, 2025                    _/s/ Allon Kedem_____
                                          Allon Kedem

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ............................................................ iii

INTEREST OF *AMICUS CURIAE* .................................................... 1

INTRODUCTION .................................................................... 4

ARGUMENT ....................................................................... 12

I.      EPA Has Correctly Interpreted TSCA's "Practicable" Standard ........ 14

II.     EPA's Risk-Management Measures Appropriately Address
        Exposure ......................................................... 16

        A.      The Rule's Restrictions on DecaBDE in Plastic Pallets Satisfy
                the Statutory Standard ................................... 16

        B.      Exposure to DecaBDE from Recycled Pallets Is Minimal and
                Adequately Controlled .................................... 17

        C.      Risk-Management Measures Effectively Address Occupational
                Exposure ................................................. 19

III.    Recycling Supports Sustainability and Avoids Counterproductive
        Outcomes ......................................................... 20

        A.      Recycling Promotes Pollution-Prevention and Responsible
                Material Reuse ........................................... 20

        B.      iGPS Pallets Exemplify Sustainable Recycling Practices ... 21

        C.      A Recycling Ban Would Be Impracticable and
                Counterproductive, Damaging iGPS's Environmentally
                Sustainable Business Model ............................... 22

CONCLUSION...................................................................... 24

CERTIFICATE OF COMPLIANCE ...................................................... 26

CERTIFICATE OF SERVICE.......................................................... 27

# TABLE OF AUTHORITIES

**Statutes and Regulations**      Page(s)

15 U.S.C. § 2605(h)(4) ................................................................ 4, 12, 14

40 C.F.R. § 751.405 ..................................................................... 23

40 C.F.R. § 751.405(a)(2)(v) ......................................................... 6

40 C.F.R. § 751.405(b) .................................................................. 6

40 C.F.R. § 751.405(c)(2) .............................................................. 8

40 C.F.R. § 751.405(e) ................................................................... 9

40 C.F.R. § 751.405(g) .................................................................. 9

86 Fed. Reg. 880 (Jan. 6, 2021) ........................................ 5, 8, 17, 19

89 Fed. Reg. 91,486 (Nov. 19, 2024) ................................... 5, 17, 23

**Other Authorities**

Commitment Letter of Albemarle Corporate submitted to EPA
Administrator Lisa P. Jackson (Dec. 15, 2009).
https://downloads.regulations.gov/EPA-HQ-OPPT-2010-1039-
0069/content.pdf ................................................................. 7

EPA Response to Public Comments, RIN 2070-AK34, (Dec.
2020), https://downloads.regulations.gov/EPA-HQ-OPPT-
2019-0080-0647/content.pdf ........................................ 9, 14, 18, 19

Polybrominated Diphenyl Ethers Action Plan (Dec. 30, 2009).
https://www.epa.gov/sites/default/files/2015-
09/documents/pbdes_ap_2009_1230_final.pdf ........................... 5, 7

## INTEREST OF *AMICUS CURIAE*[1]

iGPS Logistics LLC (iGPS) is the operator of a multi-use "pool" of plastic shipping pallets that are leased to manufacturers and retailers for shipping and storing goods. iGPS pallets are composed of plastic materials that enable damaged pallets to be reused as recyclable raw materials in the formation of replacement pallets or other products. The recyclability of iGPS shipping pallets is a central feature of the company's business and integral to its goal of maintaining an environmentally sustainable business model.

iGPS pallets were originally produced by a third party using a highly specialized, fire-resistant polymeric composite matrix that contained small quantities of decabromodiphenyl ether (decaBDE).[2] Use of decaBDE—which at the time was the most widely used and accepted fire retardant in the world—enabled the iGPS pallet fleet to meet fire-safety standards applicable

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person (other than *amicus curiae* or its counsel) contributed money that was intended to fund the preparation or submission of this brief. All parties consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

[2] The supplier of iGPS shipping pallets ceased using decaBDE in the plastic resin used for pallets by the end of 2012, a date prior to the deadline that EPA negotiated with the major decaBDE manufacturer for ceasing production of decaBDE in the United States.

to facilities where goods are stored. When recycled, no additional decaBDE is added to the raw materials used to form new iGPS pallets, and no other chemically similar flame retardant is added to the recycled pallet.

The introduction of plastic shipping pallets by iGPS in 2007 represented the first significant innovation in shipping pallets in decades. The plastic and structural materials used in iGPS plastic pallets enable them to be lighter, safer, and stronger than wood pallet alternatives, while remaining re-useable for a significantly longer period of time. Lighter pallets are environmentally preferable to wood; they translate into shipping more product weight, thus requiring less fuel and resulting in lower carbon emissions when compared to a heavier wood pallet alternative.

These and other benefits derived from the innovative nature of iGPS pallets have been documented extensively in the numerous materials supplied to the U.S. Environmental Protection Agency (EPA) under the Toxic Substances Control Act (TSCA). These materials were provided by iGPS in written comments submitted during the various iterations of the rulemaking for persistent, bioaccumulative, and toxic chemical substances (PBTs), as well during direct consultations with agency personnel that date back many years before the 2016 amendments to TSCA. Such materials are reflected in the

docket for the 2019 proposal for the 2021 final rule, as well as the subsequent amendments resulting in the current rule on risk management for PBTs— referred to here, together with subsequent amendments, as "the Rule."

As the only company in the United States that operates a nationwide pallet pooling system founded on the use of a fleet of recyclable plastic pallets, iGPS is uniquely positioned to assist the Court in evaluating the Rule as it applies to plastic shipping pallets. iGPS has firsthand operational knowledge of how pallets are manufactured and used in commerce; how shipping pallets move in commerce; and, ultimately, how iGPS pallets are recycled. Unlike chemical manufacturers, iGPS did not produce decaBDE, nor does it profit from the sale of decaBDE. Its sole interest is in ensuring that its plastic shipping pallet fleet remains safe, sustainable, and compliant with applicable law. iGPS therefore offers a neutral and experience-based perspective on the development of, and amendments to, the PBT rule that other parties may not provide.

This case presents the question of whether EPA has regulated under Section 6(h) of TSCA in a manner that will reduce exposure to decaBDE to the extent practicable, as required by the statute. As the sole company involved in the use and recycling of a national pooled fleet of plastic pallets that contain

decaBDE, iGPS has a critical interest in ensuring that the Court understands how the pallets are used and recycled, how recycling these pallets is safe and benefits the environment, and how the Rule's provisions concerning decaBDE in pallets do indeed reduce exposure to decaBDE (under this particular condition of use) to the extent practicable.

## INTRODUCTION

In 2016, Congress amended the Toxic Substances Control Act by adding Section 6(h), 15 U.S.C. § 2601 *et seq.*, which directs EPA to take expedited action to complete risk-management rules on certain PBTs pursuant to TSCA's rulemaking procedures in Section 6(a). Unlike other procedures required for a Section 6(a) rulemaking, the PBTs provision did not direct EPA to evaluate the risks presented by the various conditions of PBT use. Nor does it require EPA to eliminate all potential risks. Instead, the prohibitions and other restrictions to be contained in such rules must "reduce exposure to the [PBT substances being regulated] to the extent practicable." 15 U.S.C. § 2605(h)(4). The statute does not define the term "practicable."

In response to this directive, in late 2016, EPA identified five substances that the agency deemed PBTs and for which it intended to impose restrictions

under Section 6(h).[3] In January 2021, EPA promulgated five rules to regulate the five substances. 86 Fed. Reg. 880 (Jan. 6, 2021). EPA later promulgated amendments to some of these rules to address certain provisions, most recently on December 3, 2024. 89 Fed. Reg. 91,486 (Nov. 19, 2024).

At issue is the TSCA Section 6 rule pertaining to decaBDE, a flame retardant once widely used in textiles, plastics, adhesives, and polyurethane foam. DecaBDE's primary use has been in high-impact polystyrene plastic, which is used (among other things) to create enclosures for computers, televisions, and other electronics.[4] Because of its widespread use in plastics that are eventually recycled, decaBDE also can be present in common consumer use goods made from recycled plastics.

As proposed in 2019, the PBTs Rule generally prohibited the manufacture (including import) and processing of decaBDE, as well as products and articles containing decaBDE. The final version of the proposed

---

[3] EPA had previously stated its commitment to efforts to limit or restrict the use of various flame retardants as part of its 2009 PBDEs Action Plan. Polybrominated Diphenyl Ethers (PBDEs) Action Plan (Dec. 30, 2009). https://www.epa.gov/sites/default/files/2015-09/documents/pbdes_ap_2009_1230_final.pdf.

[4] For further background on the history of use of decaBDE, see the discussion in EPA's 2009 "PBDEs Action Plan." *Id*.

Rule was issued January 6, 2021, and the general prohibition on the manufacture (including import) of decaBDE was effective as of March 8, 2021. The January 2021 final Rule, however, contained a number of important exemptions, for example: certain flame-retardant curtains used in the hospitality sector; certain uses in aerospace applications; and uses of decaBDE in insulated wiring and cables in nuclear-energy facilities.

Of particular significance here, the Rule exempted the continued distribution in commerce of existing plastic shipping pallets manufactured prior to March 8, 2021, continuing through the end of the pallets' service lives. 40 C.F.R. § 751.405(a)(2)(v). The Rule also specifically excluded from its scope the continued "[p]rocessing and distribution in commerce for recycling of decaBDE-containing plastic from products or articles and decaBDE-containing products or articles made from such recycled plastic, where no new decaBDE is added during the recycling or production processes." 40 C.F.R. § 751.405(b). Both of these terms were of particular importance to iGPS, as they ensured its continued ability to operate its plastic shipping pallet fleet in accordance with the sustainable practices on which the iGPS business was founded.

Significantly—though the Parties' briefs neglect to mention it—the initial decaBDE rule retained EPA's longstanding commitment, made during the voluntary phasedown agreement with decaBDE manufacturers, that the use of existing decaBDE-containing products would *not* be prohibited, and that recycling of decaBDE-containing articles would be permitted to continue. EPA's commitment to such an approach to regulating decaBDE was stated publicly by EPA in a 2009 "Action Plan" concerning regulating certain PBT flame retardants. In discussing EPA's negotiated agreement with decaBDE manufacturers to discontinue manufacturing of decaBDE in the U.S., the agency stated that the commitments being made with decaBDE manufacturers "would not affect articles made with decaBDE. Recycling of materials containing decaBDE would also not be affected by the commitment." Polybrominated Diphenyl Ethers (PBDEs) Action Plan," § X.2(c) at p. 13. https://www.epa.gov/sites/default/files/2015-09/documents/pbdes_ap_2009_1230_final.pdf. Thus, one of the major decaBDE manufacturers stated in a commitment letter its understanding that "voluntary phase out of decaBDE will not affect sale/resale/disposal/continued use of finished products made with pre-phaseout decaBDE, the recycling of products that contain decaBDE, or the sale of any products made from recycled materials." Commitment

Letter of Albemarle Corporate submitted to EPA Administrator Lisa P. Jackson (Dec. 15, 2009). https://downloads.regulations.gov/EPA-HQ-OPPT-2010-1039-0069/content.pdf.

At the time of issuing the initial decaBDE Section 6 regulation, EPA also exempted from the recordkeeping provisions in the 2021 final Rule activities related to decaBDE-containing shipping pallets and distribution in commerce and the recycling of plastic from products or articles containing decaBDE and products that are produced using such recycled content (where no new decaBDE is added during recycling and productions processes). 40 C.F.R. § 751.405(c)(2), as originally promulgated in 86 Fed. Reg. 880 (Jan. 6, 2021).

Like the 2021 proposal, the 2024 amendments to the Rule retained EPA's commitments made during the decaBDE phase-down negotiations with manufacturers without changes to the provisions that permit the continued distribution of plastic shipping pallets manufactured prior to March 2021 and the recycling of decaBDE-containing pallets (as well as the presence of decaBDE in plastic that contains recycled content). The amended Rule also imposes a number of additional obligations applicable to those who process plastic shipping pallets that contain decaBDE (including those who recycle them). These additional requirements include worker protections such as

posting signage in pallet recycling workplaces, requiring use of respirators by workers engaged in plastic pallet recycling activities, a written respiratory protection program, personal protection equipment (PPE) training, dermal protection, and workplace protection records. 40 C.F.R. § 751.405(e). Releases of decaBDE to water during shipping pallet recycling operations also are prohibited. *Id.* § 751.405(g).

The provisions regarding plastic shipping pallets in the 2021 Rule were initially promulgated, and later amended by EPA, after taking into consideration written comments and materials communicated during in-person meetings with numerous interested parties, including multiple environmental public interest groups and the National Tribal Toxics Council. The information considered by EPA also included the detailed information and data submitted by iGPS. EPA dutifully considered all such feedback and, in the final regulations, extensively addressed public input in preamble language and responses to specific comments in the rulemaking docket. *See* EPA's December 2020 Response to Public Comments document in the 2021 final rulemaking docket, https://downloads.regulations.gov/EPA-HQ-OPPT-2019-0080-0647/content.pdf.

Petitioners in this case contend generally that the decaBDE regulations violate TSCA because the Rule's risk-management measures do not adequately address decaBDE' s risks of injury to health or the environment, nor do they adequately reduce human and environmental exposure. But Congress did not direct EPA to completely eliminate *all* exposure to PBTs, nor to reduce exposure at any cost. Rather, Section 6(h) explicitly requires EPA to reduce exposures "to the extent practicable." That statutory phrase reflects a balancing mandate, requiring EPA to consider feasibility, achievability, and reasonableness in light of the circumstances. The agency discussed its rationale and interpretation of the statutory standard (including the legislative history) not only in the Preamble to the 2021 final Rule, but also in its 2020 Response to Public Comments, which, in the interest of brevity, is not recited at length here.

In sum, given the 2016 amendments, and the deadlines imposed on EPA by the terms of the statute, EPA correctly concluded it was not required to undertake a lengthy risk evaluation for decaBDE and its numerous uses. Instead, the agency chose to implement the requirement of Section 6(h)(4) by issuing a rule reducing exposures of each PBT chemical "to the extent practicable," taking into consideration the various materials already available

to EPA at the time of the 2016 amendments to TSCA and the additional materials that EPA compiled during the brief period following the 2016 amendments and prior to the initial PBTs rulemaking.

In the case of decaBDE, and the 2024 amendments to the original decaBDE regulation, EPA acted consistent with Congress's instructions by adopting a narrow, carefully tailored, and limited exception for the continued use (and recycling) of existing plastic shipping pallets containing decaBDE, and the distribution and use of plastic containing decaBDE due to the presence of recycled content. The exceptions are designed to permit the continued practice of recycling such pallets, and to require certain related workplace practices and the use of PPE to ensure worker safety. The Rule also includes other restrictions, such as a more-general prohibition on the release to water of materials containing decaBDE.

Unlike consumer goods, which are used in homes where direct and routine contact with consumers are likely to occur, plastic shipping pallets are used in commercial settings where there are limited, if any, opportunities for regular and direct consumer contact. EPA's regulatory determinations with respect to the recycling of plastic shipping pallets also reflects the agency's longstanding policy more generally, and Congress's legislative directives in

the Pollution Prevention Act, 42 U.S.C. § 13101 *et seq.*, to encourage the practice of recycling. These policy and regulatory determinations, when factored into the decaBDE Rule, do not reflect a regulatory "loophole" created by mistake. Rather, they constitute calibrated risk-management measures that achieve meaningful and practicable reductions in exposure, while simultaneously preserving essential supply chain functions and recycling capacity, leading to environmental sustainability consistent with longstanding EPA objectives.

At a minimum, the Court should deny Petitioners' request to remand the Rule to EPA as applied to the provisions that concern decaBDE in plastic pallets. Petitioners ask the Court to order EPA to propose amendments "that mandate all practicable measures," but the Amended Rule's provisions concerning decaBDE in pallets already meet the statutory requirements.

## ARGUMENT

EPA acted within its statutory authority under Section 6(h) of TSCA when it declined to ban the recycling of plastic pallets containing decaBDE. TSCA requires EPA to reduce exposure to PBT substances "to the extent practicable," 15 U.S.C. § 2605(h)(4), a standard that inherently demands consideration of feasibility, reasonableness, and collateral consequences.

12

Petitioners' interpretation disregards this statutory qualifier and improperly treats TSCA as a mandate for absolute elimination of exposure.

EPA's interpretation of "practicable" is consistent with the statutory text and agency precedent. The agency reasonably concluded that banning recycling would be overly burdensome, environmentally counterproductive, and not technically or economically feasible. EPA also imposed targeted risk-management measures—including robust occupational safeguards—that adequately address the minimal risk posed by decaBDE in recycled pallets.

Moreover, EPA's decision promotes sustainability, pollution prevention, and responsible material reuse. This is consistent with the so-called "pollution prevention hierarchy" espoused by environmental interest groups around the globe, and also conforms with EPA's duty to encourage recycling under the Pollution Prevention Act. Recycling reduces the total stock of decaBDE in commerce, aligns with national environmental goals, and avoids premature disposal and landfilling of usable materials.

The agency's Rule reflects a balanced, evidence-based approach that satisfies TSCA's statutory standard. Petitioners themselves have acknowledged in their opening brief that the amended Rule, to the extent it applies to activities involving plastic shipping pallets, includes provisions to

mitigate potential workplace exposures during recycling operations for decaBDE-containing shipping pallets. The Rule should be upheld.

## I.   EPA HAS CORRECTLY INTERPRETED TSCA'S "PRACTICABLE" STANDARD

TSCA provides that, in selecting among prohibitions and other restrictions promulgated in a rule to restrict PBT substances, EPA shall address the risks of injury to health or the environment that the agency determines "are presented by the chemical substance and shall reduce exposure to the substance to the extent practicable." 15 U.S.C § 2605(h)(4).

EPA has consistently read the term "practicable" as including feasibility as a factor, but also what is reasonable in light of *all* circumstances. *See* EPA Response to Comments at 24, RIN 2070-AK34 (Dec. 2020). EPA thus interprets the phrase "reduce exposures to the extent practicable," consistent with dictionary definitions, to consider such factors as "achievability, feasibility, workability and reasonableness." *Id.* at 25. Whether a regulatory option is achievable, feasible, workable, and reasonable inherently takes into consideration all of the relevant circumstances, such as economic burden and complexities, the utility of the chemical, and whether there are technically and economically feasible alternatives available. *Id.* at 26.

14

EPA complied with those requirements when regulating the use of decaBDE in plastic pallets. In so doing, EPA weighed the benefits of recycling, the impact of restrictions on recycling, the minimal (if any) risk posed by recycling, and the proposed risk-management measures. The agency ultimately concluded that the proposed measures indeed accomplish reducing exposure decaBDE to the extent practicable and that banning the recycling of pallets containing decaBDE would *not be* practicable.

Petitioners' contrary interpretation of Section 6(h) would effectively read "to the extent practicable" out of the statute, treating TSCA as a mandate for absolute elimination of all potential risks—regardless of feasibility or collateral harms. That is not what Congress said. The phrase "to the extent practicable" reflects Congress's understanding that chemical risk management requires tradeoffs: Measures must be achievable, workable, and reasonable, taking into account the utility of the chemical, the availability of technically and economically feasible alternatives, and the consequences of premature or impracticable restrictions.

II.   **EPA'S RISK-MANAGEMENT MEASURES APPROPRIATELY ADDRESS EXPOSURE**

A.   **The Rule's Restrictions on DecaBDE in Plastic Pallets Satisfy the Statutory Standard**

Pallets differ from other articles containing decaBDE. In shipping pallets, the starting materials are included in a resin that fully encapsulates them as part of hard, polymer matrix when formed into the finished article. The matrix significantly reduces the potential for volatilization or migration of the small quantity of decaBDE encased therein. Unlike household and consumer goods, which may be touched or mouthed by children, shipping pallets are used in commercial shipping and warehousing environments, where direct incidental contact by consumers is not anticipated to occur. Moreover, EPA has required in the 2024 regulation robust occupational safeguards—including respirators, dermal protection, PPE training, signage, and recordkeeping—to ensure that workers who are involved in pallet recycling activities involving potential for contact with the shipping pallets will remain fully protected. With these measures in place, EPA reasonably determined that exposure pathways from decaBDE-containing shipping pallets are minimal and that any residual risks have been reduced to the extent practicable, fully satisfying TSCA's statutory standard.

EPA's Rule also acknowledges the importance of recycling, which contributes to American prosperity and the protection of our environment. Speaking to the recycling of decaBDE-containing plastics generally, EPA found that it would be overly burdensome and not practicable to impose restrictions on the recycling of decaBDE-containing plastics generally, or on the use of recycled plastic in production of plastic articles, for a number of reasons. 86 Fed. Reg. at 886. These include: the low levels of decaBDE in the plastics; the limited potential exposure to decaBDE from plastics; the significant prohibitions on manufacturing and processing of decaBDE adopted in the PBT rule; the further limitations imposed in the amendments; the ever-decreasing amount of recycled plastic expected to contain decaBDE; the expensive and complicated testing that would be required to determine the presence of decaBDE in materials intended for recycling; and the resulting need to create a waste stream sorting and separation method for decaBDE containing articles. Such measures would make all plastic recycling significantly more expensive and potentially cost prohibitive.

## B. Exposure to DecaBDE from Recycled Pallets Is Minimal and Adequately Controlled

As originally incorporated into the iGPS shipping pallet fleet, decaBDE was present only at low levels. *See* 89 Fed. Reg. at 91,495. Additionally, once

formed into a plastic shipping pallet, decaBDE is encased in the polymer matrix. As a result, the potential for human exposure to decaBDE present in such shipping pallets remains minimal throughout its service life. DecaBDE is not expected to volatize or migrate from an intact shipping pallet readily under normal use. *See* Response to Comments at 61. Data obtained during practical use studies of shipping pallets, and other information submitted by iGPS to EPA during the course of the various decaBDE rulemaking proceedings, has documented this attribute. These data and other sources of information were clearly considered by EPA; the agency's careful review of such material in the administrative record cannot be so easily discounted by Petitioners.

In addition, iGPS operates a "closed loop" system in which it uses, as raw materials for newly manufactured pallets, material derived from damaged pallets from its own shipping pallet fleet and "virgin" plastic (*i.e.*, plastic that is not expected to contain decaBDE). Thus, the agency could reasonably conclude that the presence of decaBDE is expected to decline in each generation of newly manufactured pallets. Moreover, iGPS's business practices are such that lessees of its pallets do not own or retain complete control over iGPS pallets. As a result, iGPS can ensure that it remains aware

of pallet locations, and the company has the ability to continue to reuse its pallets until the end of the pallet's service life, at which point it can be recycled.

Furthermore, given international and domestic restrictions on the use of decaBDE generally, and the transition to the use of other flame retardants, EPA reasonably expects that the amount of recycled plastic generally that contains decaBDE from recycled content to continue to decline significantly over time. *See* 86 Fed. Reg. at 889. Consequently, decaBDE will not be present in manufactured articles that contain recycled plastics in levels that could reasonably expected to pose a meaningful risk to product users.

## C. Risk-Management Measures Effectively Address Occupational Exposure

EPA has acknowledged that decaBDE may potentially be released by plastics in certain limited circumstances, such as abrasion or the direct transfer to dust on surfaces, heating and melting of the plastics, or grinding and shredding operations. *See* Response to Comments at 61. Inhalation and dermal exposures are possible during recycling occupational scenarios, though only if workers are unprotected. *Id.* EPA therefore proposed a number of obligations applicable to those who process decaBDE-containing plastics, including recycling plastic shipping pallets. These include: signage, workplace protection including respirators, a written respiratory protection program,

19

PPE training, dermal protection, and workplace protection records. These risk-management measures appropriately and practicably address the small risk of exposure to decaBDE that could occur in an occupational setting.

## III. RECYCLING SUPPORTS SUSTAINABILITY AND AVOIDS COUNTERPRODUCTIVE OUTCOMES

### A. Recycling Promotes Pollution-Prevention and Responsible Material Reuse

The recycling of pallets delivers significant environmental and public health benefits. Prohibiting recycling would force companies to incinerate large volumes of plastic or send them to landfills, creating unnecessary waste burdens on already overburdened disposal facilities and increasing the potential for uncontrolled releases of decaBDE into the environment.

The environmental benefits of recycling are noted above and in the docket; in the context of decaBDE, they were reflected as a policy matter in EPA's 2009 Action Plan for certain flame retardants. Recycling captures and reuses existing material in a controlled setting—in the case of shipping pallets, with workplace protective measures in place. This approach reasonably and gradually dilutes the concentration of decaBDE in reformed pallets over time (because no new decaBDE is introduced). More broadly, recycling gradually reduces, rather than increases, the total stock of decaBDE in commerce.

As explained above, and as reflected in iGPS's comments and the information it has supplied to the Agency's rulemaking docket, iGPS pallets are produced in a fashion that allows damaged pallets to be recycled and reused in "new" replacement pallets, providing a distinct environmental advantage over wood pallets. Wood pallets that become broken and unusable are often disposed in landfills and cannot be reused. Fresh lumber is needed for new wood pallet construction, which has implications for deforestation and raises climate change concerns. These issues are not present with iGPS pallets. EPA's decision thus aligns with national sustainability goals, promoting a circular economy and preventing the premature disposal of pallets that still have productive uses.

## B.    iGPS Pallets Exemplify Sustainable Recycling Practices

Plastic pallets have numerous advantages over wood pallets, making iGPS pallets the environmentally preferred option. Plastic pallets are light, strong, and sustainable: long-lasting, while providing a lightweight shipping platform that provides high transportation efficiency. iGPS pallets are produced using plastic materials that enable damaged pallets to be reused as recyclable raw materials in replacement pallets. This represents a model of

sustainable business practices—activity that is appropriately described as "pollution prevention."

Damaged iGPS pallets are removed from service and disassembled so the plastic can then be effectively recycled, melted, and reformed into replacement pallets. Using the recycled remnants of damaged pallets that have been removed from service as a raw material in reformed iGPS pallets reduces waste and the unnecessary environmental loading of plastics. No additional decaBDE (or other halogenated flame retardant) is added during the recycling process. Consistent with this approach, an independent lifecycle analysis that iGPS provided to EPA concluded that iGPS pallets have a dramatically lower environmental impact than wood shipping pallets.

### C. A Recycling Ban Would Be Impracticable and Counterproductive, Damaging iGPS's Environmentally Sustainable Business Model

Banning the recycling of plastics containing decaBDE, including pallets, would require decaBDE-containing plastic in the recycling stream to be identified through prohibitively expensive and complicated testing. It would also require decaBDE-containing plastic to be separated from other types of plastic before recycling, which is usually done manually. It would be difficult to make plastic sorting for this purpose to be cost-effective, disincentivizing

22

the recycling of any plastic materials. *See* 89 Fed. Reg. at 91.465. Consequently, it would be overly burdensome and not practicable to prohibit recycling of decaBDE-containing plastic in the United States at this time.

In the context of iGPS shipping pallets, moreover, no new decaBDE will be added through the recycling process. As uncontaminated plastic is added to new pallets, the amount of decaBDE will decrease over time. Recycling existing pallets prevents usable material from being landfilled or incinerated. It keeps the material in productive use, aligning with EPA's waste-reduction and sustainability goals. Banning recycling of products and articles that contain decaBDE could incentivize premature disposal of products, such as iGPS shipping pallets, that objectively still have years of service life, leading to unnecessary environmental burdens and unintended adverse consequences. Consequently, if retained without changes, the risk-management measures that EPA has already codified for pallets containing decaBDE, *see* 40 C.F.R. § 751.405, clearly will continue to reduce exposure to decaBDE to the greatest extent practicable.

## CONCLUSION

The Rule's provisions concerning pallets exemplify EPA's careful implementation of Congress's directive under Section 6(h) of TSCA: They reduce decaBDE exposures to the extent practicable, while balancing health and environmental protection requirements with feasibility, achievability, and environmental sustainability. EPA did not abdicate its duty; rather, it made a reasoned, evidence-based determination that recycling pallets within strict safeguards (including prohibitions on releases of decaBDE to water and with worker protection measures for pallet recyclers) provides greater overall protection to health and the environment than an outright ban on recycling of decaBDE-containing plastics.

Overly restrictive measures, like those advocated by Petitioners, would ultimately result in the premature disposal and landfilling of useful and recyclable products and materials. To prevent those environmentally harmful results, and to avoid supply chain disruptions, the plastic pallets in iGPS's fleet must be recycled at the end of their service life, and the plastic and structural components must be reused. The Court should uphold EPA's judgment and decline to remand the shipping pallet-related provisions of the Rule.

24

Dated: October 6, 2025

Respectfully submitted,

*/s/ Allon Kedem*
Allon Kedem
Lawrence E. Culleen
Judah Prero
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
allon.kedem@arnoldporter.com

*Counsel for iGPS Logistics LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 9th Cir. R. 32-1 because the brief contains 4,595 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6), respectively, because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Century Expanded BT 14-point font.

Dated: October 6, 2025                    */s/ Allon Kedem*
                                          Allon Kedem

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the ACMS filing system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by ACMS.

*/s/ Allon Kedem*
Allon Kedem
